**Herbert Ray WILSON, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 14–09–01040–CR.**

Court of Appeals of Texas, Houston (14th Dist.).

April 12, 2011.

Rehearing Overruled Aug. 10, 2011.

Danny K. Easterling, Houston, for appellant.

Bridget Holloway, Houston, for appellee.

Panel consists of Justices ANDERSON, SEYMORE, and McCALLY.

## OPINION

JOHN S. ANDERSON, Justice.

Appellant, Herbert Ray Wilson, was convicted of capital murder and sentenced to life in prison without the possibility of parole. He appeals four points of error on this appeal. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

On the night of September 11, 2007, appellant and several of his friends visited Tierra Humphries' apartment. Humphries stated her female friends Kerri Hubbard and Alli'e Babers were also present. Hubbard testified the men exited and entered the apartment several times that evening, but during the evening she saw appellant robbing cars in the parking lot. Eventually, Hubbard explained, appellant and two of his friends, Eric Young and Eldrick Telefore, departed the apartment together. Hubbard testified she later heard a gunshot and saw all three men running to Humphries' apartment. She testified that Young and Telefore held nothing in their hands upon their return, but appellant carried a crowbar, gun, and computer monitor. Hubbard testified that Young and Telefore appeared frightened, but appellant appeared angry. She further stated that appellant told her that if "y'all say anything, then I'm going to kill y'all ..."

Kelvin Parker testified he was outside the apartment he shared with his pregnant girlfriend, Anternett Thomas, that evening. Parker stated he noticed that the dome light in Thomas' car was on, so he decided to investigate. Upon approaching the vehicle, he realized the radio had been removed. Then Parker noticed a "black male" putting items in the back of a truck he knew was owned by Hispanic individuals. Parker confronted the man, who had "some kind of bandana" wrapped around his hand. Parker explained this gesture signaled the man intended to fight. Parker witnessed the man walking towards Humphries' apartment.

Parker stated he then returned home, got his car keys, told Thomas to lock the doors, and left the apartment complex in Thomas' car to collect his friend, Terryl Senegal. He decided Senegal should be present because he wanted someone to "fight with me if it came down to that." Upon returning, Parker explained he and Senegal went to Parker's apartment. Parker stated that upon entry, they found Parker's computer on the floor with the monitor missing. Senegal articulated that Parker looked for Thomas, but could not locate her until Parker discovered the bathroom door was blocked and requested Senegal's help to open it. Senegal stated he pushed the door, eventually opening it enough to see blood and Thomas' body on the floor.

Dr. Morna Gonsoulin, assistant medical examiner for Harris County, testified Thomas died of a gunshot to the head. Dr. Gonsoulin explained the gun was probably less than six inches from Thomas' head when the bullet was fired. Neither Thomas nor her fetus survived.

Officer Richard Martinez of the Houston Police Department testified that based upon statements and photo identification of appellant by Humphries, Hubbard and Baber, he arrested appellant the day after Thomas' death. Officer Martinez stated he initially handled the statement of another individual involved in the case while Officer Curtis Scales interviewed appellant. According to Officer Martinez, after he finished with the other person, he joined Officer Scales and participated in appellant's interview. Appellant confessed to robbing the cars, but did not confess to Thomas' killing at that time.

The following day, Sergeant Brian Harris interviewed appellant at the request of Officers Martinez and Scales. Sergeant Harris gave Miranda[1] warnings to appellant at the start of the interrogation. Ap-

---

1. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

pellant waived his Miranda rights. The transcript of the interview shows, Sergeant Harris had two primary discussion points that he returned to throughout the interrogation:

(1) The difference between justice and mercy. Sergeant Harris defined justice as "getting what [you] deserve" and mercy as "giving what people need." Sergeant Harris also suggested that appellant may have been afraid of Parker and had no intention of killing anyone when appellant shot the gun. In a variation on the theme, Sergeant Harris stated that appellant needed to "be real" and "be a man" by taking responsibility for his actions.

(2) The stress a trial would cause appellant's mother. Sergeant Harris then discussed how appellant might be portrayed in the press as a "monster," the effects on the mother of having to sit through a trial, and the possibility appellant's mother might "mortgage" everything she owned to try to help her son.

Initially maintaining his innocence, appellant later confessed to killing Thomas. During the course of follow-up questions, he also admitted taking Parker's computer monitor from the apartment when he fled.

 Appellant was charged and convicted of capital murder. *See* Tex. Penal Code Ann. § 19.03(a)(1) (West 2010). He was seventeen years old at the time of the killing, so he was not eligible to receive the death penalty. *Roper v. Simmons*, 543 U.S. 551, 575, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005). Upon conviction for capital murder, he received an automatic life sentence without the possibility of parole. Tex. Penal Code Ann. § 12.31(b)(2) (West 2010).

## I. Appellant's Confession to Thomas' Killing Was Voluntary, so the Trial Court Did Not Err in Allowing the Jury to View the Confession.

Appellant argues his confession was involuntary because Sergeant Harris implied he would receive a lesser sentence in exchange for confessing, and manipulated appellant's emotions to gain a confession.

### A. Standard of Review

 Voluntariness of a confession is a mixed question of law and fact. *Garcia v. State*, 15 S.W.3d 533, 535 (Tex.Crim.App. 2000). We review the trial court's ruling on a motion to suppress under a bifurcated standard of review. *Carmouche v. State*, 10 S.W.3d 323, 327 (Tex.Crim.App.2000). We give almost total deference to the trial court's determination of facts while we review the issues of law de novo. *Id.* We review the totality of the circumstances to determine voluntariness. *Lane v. State*, 933 S.W.2d 504, 512 (Tex.Crim.App.1996).

### B. Analysis

 Appellant argues that Sergeant Harris committed constitutional "overreaching" that created an involuntary confession. *See Colorado v. Connelly*, 479 U.S. 157, 163–64, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986). A confession is involuntary if the totality of the circumstances indicates that the defendant's will was "overborne" by police coercion. *Creager v. State*, 952 S.W.2d 852, 856 (Tex.Crim.App.1997). Appellant argues his confession was involuntary for two primary reasons:

(1) Sergeant Harris implied appellant would receive lesser punishment for confessing. This included offering to "paint a different picture for the District Attorney" of the crime, something appellant claims a grown man might have understood meant little, but appellant could not be expected to know. Appellant also argues it would be "inconceivable" that Sergeant Harris was unaware an automatic sentence of life without parole

would be imposed if appellant was convicted after he confessed to the crime. Thus, appellant argues, the conversation about mercy was, in effect, a lie told by Sergeant Harris.

(2) Appellant also argues that Sergeant Harris' discussion of his mother spending her money on his defense was inconsistent with the Miranda warning that appellant could receive appointed counsel, thus helping make appellant's confession involuntary.

Both Sergeant Harris and appellant testified at the suppression hearing held by the trial court. The trial court also had the opportunity to view the recording of the confession. Thus, the trial court had requisite knowledge to make factual determinations.

## 1. Justice and Mercy Discussion

▮ A confession is rendered inadmissible due to improper inducements if there is (1) a promise of some benefit to the accused; (2) that is positive; (3) made or sanctioned by someone in authority; (4) and that it is of such an influential nature that it would cause a defendant to speak untruthfully. *Martinez v. State*, 127 S.W.3d 792, 794 (Tex.Crim.App.2004).

We begin by noting this court does not have any evidence in the record about whether Sergeant Harris believed appellant would be charged with capital murder. A police officer may know the elements of capital murder and other chargeable homicide offenses, but does not make the ultimate determination on charging a defendant. *See* Tex. Penal Code Ann. § 19.03 (West 2010); Tex.Code Crim. Proc. Ann. arts. § 20.03, 20.20–21, 21.21 (West 2010). We also find no evidence Sergeant Harris had proof prior to the confession that appellant committed capital murder instead of a lesser homicide offense.

Sergeant Harris testified during the suppression hearing that his use of the themes justice and mercy did not imply that a deal was possible. Sergeant Harris stated appellant acknowledged this fact when he placed phone calls and stated he would be going to prison "for a minute." Sergeant Harris explained "for a minute" was slang for "a long time." In addition, Sergeant Harris informed appellant that he stated he would speak to the District Attorney, but never promised any deal for the defendant. In contrast, appellant testified that, "Sergeant Harris told me if I told him what he wanted to hear, that he would talk to the D.A. about letting me go home."

The recorded interrogation confirms that the conversation began with a general discussion regarding the meaning of justice and mercy. Sergeant Harris defined justice as "getting what [one] deserves," even if that is a severe punishment. However, Sergeant Harris opined, "[W]e don't live in a society of justice because if I got ... everything that I deserved for the things [that] I've done ... this would be a hard place to live." He contrasted justice with mercy, which he defined as "getting what you need," or leniency and forgiveness.

Sergeant Harris then posited some theories of the murder which would have made appellant less culpable and discussed the effect a trial would have on appellant's mother. Sergeant Harris also informed appellant that other police officers believed he was a "cold-hearted bastard that you had no feelings ... and that you ... at some point said just go [a]head [and] give me the needle and that's a bunch of garbage man." Sergeant Harris remarked, "You got to explain something ... It's the right ... thing to do ... then I can call the district attorney and say hey this is what really happened this guy didn't mean

for this stuff to go on. Do you understand, there's consequences regardless for your actions ... but its either you're gonna be looked at with the eyes of justice, this guy deserves the worst ... or the eyes of mercy ... Herbert is not that evil monster that he is painted to be."

Appellant argues these statements were improper inducements because there was a promise of "mercy" if he confessed, which was impossible because he confronted an automatic sentence of life without the possibility of parole. Assuming *arguendo* that appellant proved the first three elements of the test of improper inducements, we conclude appellant cannot demonstrate the fourth element. *Martinez*, 127 S.W.3d at 794. The statements about justice and mercy would be unlikely to induce an innocent person to confess to murder. If justice is "getting what [you] deserve," an innocent person would probably continue to plead his innocence. Furthermore, the promise to "call the district attorney and say ... what really happened" does not create an involuntary confession. *Herrera v. State*, 194 S.W.3d 656, 660 (Tex.App.-Houston [14th Dist.] 2006, pet. ref'd) (statement "We can talk to the D.A., get you an offer, if you can help us" did not induce an involuntary confession). We overrule appellant's objection on this point.

**2. Discussion of Appellant's Mother Using Her Money to Assist in Appellant's Defense**

■ Appellant also argues that Sergeant Harris induced an involuntary confession with his statement, "[Y]ou're gonna say that you're an innocent person and your momma's gonna spend all kinds of money to try to help you out and [if she] own[s] a house [or] car she's gonna put all that up for mortgage ... and she's gonna say we'll do all this[,] we're gonna fight for him ... [I]t's gonna destroy her[.][S]he will lose everything." Appellant contends

these discussion points directly oppose appellant's right to receive appointed counsel, which helped make the confession involuntary.

■ Police officers are permitted to suggest that suspects decline legal counsel to "save himself or his family the expense" despite the constitutional requirement that suspects be informed that they have a right to appointed counsel. *Miranda*, 384 U.S. at 454, 86 S.Ct. 1602. Thus, we cannot say as a matter of law that all discussion about the expense of legal representation is so contrary to the right to appointed counsel that it creates involuntary confessions. Nonetheless, police discussion of economic hardship might form enough pressure to overcome some defendants' will and create involuntary confessions. *See Creager*, 952 S.W.2d at 856. Consequently, the inquiry into whether such statements by the police overcame the will of the defendant requires a factual determination. *See id.* As an appellate court, we give almost total deference to a trial court's rulings on fact issues regarding confessions. *Carmouche*, 10 S.W.3d at 327. The trial court in appellant's case heard the evidence and concluded that the confession was voluntary. We decline to overrule the trial court's factual determination, and therefore determine the conversation about appellant's mother did not create an involuntary confession.

Appellant's first point of error is overruled.

**II. An Automatic Sentence of Life Without Parole Is Constitutional Under the Eighth Amendment to the U.S. Constitution.**

■ Appellant argues his sentence of automatic life without the possibility of parole upon conviction was cruel and unusual punishment because he was a juve-

nile at the time of Thomas' killing. He argues the Eighth Amendment to the U.S. Constitution requires a jury consider mitigating circumstances and reduce his sentence.

The Eighth Amendment prohibits "cruel and unusual punishment" for crimes. U.S. Const. amend. VIII. This requirement is applicable to the states through the due process clause of the Fourteenth Amendment. *Robinson v. California*, 370 U.S. 660, 666–67, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962). The U.S. Supreme Court has determined that juveniles may never receive the death penalty for any crime because that sentence violates the Eighth Amendment. *Roper v. Simmons*, 543 U.S. 551, 575, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005). Most recently, the U.S. Supreme Court has also determined that juveniles convicted of non-homicide crimes may not be sentenced to life imprisonment without the possibility of parole. *Graham v. Florida*, —— U.S. ——, 130 S.Ct. 2011, 2034, 176 L.Ed.2d 825 (2010).

Using the analysis found in death penalty cases and *Graham*, appellant asks us to extend the law and find that the Texas statute creating an automatic sentence of life without the possibility of parole for juveniles is unconstitutional. Appellant provided a well-researched, cogent brief on this point for our consideration.

After the submission of appellant's brief, however, the Texas Court of Criminal Appeals considered this issue. *Meadoux v. State*, 325 S.W.3d 189 (Tex. Crim.App.2010). In that case, the defendant was a juvenile convicted of capital murder and sentenced to life imprisonment without the possibility of parole, just as appellant is. *Id.* at 192. The Court of Criminal Appeals stated that when faced with a challenge like appellant's, we "must consider: (1) whether there is a national consensus against imposing the punishment for the offense; (2) the moral culpability of the offenders at issue in light of their crimes and characteristics; (3) the severity of the punishment; and (4) whether the punishment serves legitimate penological goals." *Id.* at 194. Furthermore, it is the appellant's burden to show these factors. *Id.*, n. 7.

### A. National Consensus

Appellant provided no evidence of a national consensus against an imposition of life imprisonment without the possibility parole.

### B. Moral Culpability

Appellant argues that his confession "indicated that the appellant did not know that he was shooting a woman, let alone a pregnant woman, when he got the gun around the door edge and fired into a person just inches away inside the bathroom." Appellant contends that "viewed in terms of what the appellant set out to do and thought he was doing at the fatal moment, this was not the worst conduct in the pantheon of capital murders." Appellant also asks this court to consider mitigating factors not found in the appellate record in our analysis, including appellant's failure in school, and possible lack of parental love and supervision. In addition, appellant pleads, in essence, that he was peer pressured by his male friends into the burglaries of the car and Thomas' home after the women in Humphries' apartment showed no interest in sexual activity with them. Appellant also argues there is some indication that he may have associated with gang, which might have had an impact on appellant's decisions.

Nonetheless, we must consider appellant's own conduct. After a confrontation with Parker, appellant did not decide to leave the apartment complex, or even retreat and remain in Humphries' apartment. Parker left the apartment complex

to retrieve Senegal; appellant could have chosen either action without danger to himself. Furthermore, according to his own confession, he made a conscious choice to enter Parker and Thomas' apartment and shoot the person in the bathroom without even confirming who he was firing at. Finally, he made a decision to take the computer monitor with him when he exited the apartment.

 Our judicial system recognizes a fundamental difference between homicide and other violent offenses. *Graham*, 130 S.Ct. at 2027. Homicide ends the life of the victim, and thus cannot be compared in its severity to crimes in which the victims live. *Id.* As a result, even serious violent crimes are different from homicide. "in a moral sense." *Id.* Therefore, whatever reduced moral culpability exists because of appellant's age or circumstances, the moral responsibility is still greater than is present for any other offenses. *Meadoux*, 325 S.W.3d at 195.

## C. Severity of Punishment

 The third factor is severity of punishment. It is undeniable that life imprisonment without possibility of parole is a severe punishment, second only to execution. *Graham*, 130 S.Ct. at 2027.

## D. Goal of Punishment

 The fourth factor is the goal of the punishment. *Meadoux*, 325 S.W.3d at 194. The Court of Criminal Appeals has adopted *Graham*'s analysis in discussing the four goals of penal sanction: deterrence, incapacitation, rehabilitation, and retribution. *Id.* at 195. If the sentence lacks penal justifications, it is disproportionate to the offense and therefore unconstitutional. *Graham*, 130 S.Ct. at 2028. We consider each purpose in light of the Court of Criminal Appeals' ruling in *Meadoux.* 325 S.W.3d at 195.

### 1. Deterrence of Others

 *Graham* stated that juveniles are less susceptible than adults to the deterrence motivation of punishment. *Graham*, 130 S.Ct. at 2028. Juveniles are less likely to consider consequences of their actions, and thus are less influenced by the possibility of life imprisonment without the possibility of parole. *Id.* Consequently, both Graham and *Meadoux* agree, any deterrence justification can be achieved by sentencing juveniles to life with the possibility of parole. *Graham*, 130 S.Ct. at 2029; *Meadoux*, 325 S.W.3d at 195–96.

### 2. Incapacitation of the Offender

 The purpose of incapacitation of the offender is to prohibit the offender from committing other crimes. *Graham*, 130 S.Ct. at 2029. Preventing recidivism is an important goal in punishment. *Id.* Appellant argues that while incapacitation works "in the short run," the issue we should consider is how long incapacitation is necessary. Appellant argues that there are empirical studies showing that "there is a marked decrease in risk [of violent behavior] as a person becomes elderly." Although appellant provides no citation for these empirical studies, we will assume that his assertion is true.

 *Graham*'s prohibition on life without parole for juveniles is limited to those juveniles who have not committed homicide; there has been no constitutional error found for compulsory sentences of life without parole for juveniles convicted of murder. *Graham*, 130 S.Ct. at 2034. The Legislature has the solemn responsibility to determine the appropriate sentences for crimes unless a constitutional prohibition exists. *Meadoux*, 325 S.W.3d at 196. The Court of Criminal Appeals believes the Legislature could reasonably believe that some offenders require life imprisonment

without the possibility of parole, including juveniles convicted of homicide. *Id.* Appellant has committed capital murder, the most serious offense possible. As a result, we cannot conclude that the incapacitation of appellant for life is disproportionate to the offense. *Id.* at 195.

### 3. Rehabilitation

■■■ Rehabilitation of convicts is one of the goals of the penal system. *Graham*, 130 S.Ct. at 2029. Life without parole, however, cannot be justified through the goal of rehabilitation because society has determined the offender may never return to it. *Id.* at 2030.

### 4. Retribution

■■■ Appellant queries, "Does retribution really demand that a person's last breath be drawn in prison, perhaps sixty or seventy years after the offense?" It is a challenging question, but we must also remember that Thomas' last breath occurred just before appellant shot her. She does not have another "sixty or seventy years." As discussed above, it is the legislature's duty to determine the appropriate sentence for an offense. *Meadoux*, 325 S.W.3d at 196. The legislature must decide the sentence that will "directly relate[ ] to the personal culpability of the criminal offender." *Tison v. Arizona*, 481 U.S. 137, 149, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987). Consequently, we conclude that it is within the legislature's discretion to choose whether retribution requires life imprisonment. *Meadoux*, 325 S.W.3d at 196.

### E. Conclusions

After weighing all the factors, we cannot conclude appellant proved that an automatic sentence of life without possibility of parole is unconstitutional. Appellant has not provided any evidence of national consensus. Furthermore, although the sentence is severe, appellant does have great moral culpability due to his actions. Finally, although appellant's punishment cannot be justified on the basis of deterrence or rehabilitation, the legislature could have determined that the goals of incapacitation and retribution justify the automatic imposition of life without parole. We overrule appellant's second issue.

### III. An Automatic Sentence of Life Without the Possibility of Parole Does Not Violate the Texas Constitution Because There Is No Right to Present Mitigation Evidence in a Non–Death Penalty Case.

■■■ Appellant argues in his third point of error that an automatic sentence of life without the possibility of parole violates the Texas Constitution Article I, Section 13. TEX. CONST. art. I, § 13. He correctly states that state constitutions can provide additional protections for criminal defendants beyond those required by the U.S. Constitution. *See Heitman v. State*, 815 S.W.2d 681, 683 n. 1 (Tex.Crim.App.1991) (listing criminal protections under the Texas Constitution that are greater than that afforded to criminal defendants under the U.S. Constitution).

The provision of the Texas Constitution at issue reads, "Excessive bail shall not be required, nor excessive fines imposed, nor cruel or unusual punishment inflicted." Tex. Const. art. I, § 13. Appellant argues that the use of the word "or" between cruel and unusual provides additional protections to the appellant. The Federal Constitution uses the phrase "cruel and unusual punishment," and appellant implies that a theoretical punishment could be cruel but not unusual and be constitutional under federal but not Texas law. U.S. Const. amend. VIII.

Appellant contends "Most Texans would think it cruel' to deny a criminal defendant

any chance to offer evidence of mitigating evidence." Furthermore, he states, only two categories of convicted offenders receive automatic sentences—capital offenders where the death penalty is waived, and certain sex offenders. Appellant provides no citations for these assertions.

The U.S. Supreme Court previously refused to extend the right to present mitigating evidence at death penalty sentencing to non-death penalty cases. *Harmelin v. Michigan*, 501 U.S. 957, 995, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991) (finding a sentence of life without parole is constitutional and the mandatory nature of such sentence does not render it unconstitutional where the death penalty is not at issue). Our sister court concluded that the Texas Constitution does not provide any additional rights to present mitigating evidence at non-death penalty cases. *Cienfuegos v. State*, 113 S.W.3d 481, 495 (Tex.App.-Houston [1st Dist.] 2003, pet. ref'd). We adopted that holding in our jurisprudence. *Bergara v. State*, 2009 WL 2476513 (Tex. App.-Houston [14th Dist.] 2009, pet. ref'd) (mem. op., not designated for publication).

■ Although we acknowledge that neither the First Court of Appeals nor our previous memorandum opinion is binding authority on us, we adopt the analysis and conclusions here. We conclude the Texas Constitution does not provide a criminal defendant in a non-death penalty case any rights to present mitigating evidence during the punishment phase. Appellant's third point of error is overruled.

## IV. There is No Violation of the Texas Constitution Because Automatic Sentences Do Not Usurp Executive Parole Officials' Authority.

■ Appellant contends an automatic sentence of life without parole violates the principle of separation of powers between the branches of government. Article II,

Section 1 of the Texas Constitution requires a separation of powers between the executive, legislative, and judicial branches. Tex. Const. art. I, § 13. The Board of Pardons and Paroles is part of the executive branch. Tex. Const. art. IV, § 11(a). In Texas, prosecutors are considered part of the judicial branch of government. *Meshell v. State*, 739 S.W.2d 246, 253, 257 (Tex.Crim.App.1987).

Appellant makes an argument he admits is novel. He contends that an automatic sentence allows the legislature to shift authority from the executive branch (Board of Pardons and Paroles) to the judicial branch (the prosecuting attorney). The theory is as follows: the legislature has constitutional authority to make the laws. By creating mandatory sentences, the authority of the Parole Board has been inappropriately vested in the prosecuting attorney because the prosecutor may now determine whether the convict eligible for Board consideration.

In support of this proposition, appellant cites a case discussing the Speedy Trial Act. *Meshell*, 739 S.W.2d at 246. The State argued that the legislature's law requiring the prosecutors to be ready within 120 days after commencement of a criminal action against a defendant violated prosecutors' discretion, and thus violated the separation of powers. *Id.* at 250–51. The Court of Criminal Appeals concluded that the Speedy Trial Act unconstitutionally violated separation of powers because it violated prosecutorial discretion. *Id.* at 257.

Appellant also cites a case in which the state's Attorney General (a member of the executive branch) asserted exclusive rights to prosecute a case over a county attorney (a member of the judicial branch). *Meshell*, 739 S.W.2d at 253, 257; *State v. Moore*, 57 Tex. 307, 1882 WL 9501 at *5 (Tex.1882). The Texas Supreme Court de-

termined that the county attorney had constitutional authority to prosecute any cases in his jurisdiction, and the Attorney General's claim was a violation of separation of powers. *Moore*, 57 Tex. 307, 1882 WL 9501 at *6–8.

We construe appellant's argument to either advocate: (1) the abolishment of all automatic sentences to prevent legislative usurpation of executive authority; or (2) a prohibition of prosecutors from prosecuting any person under a statute that requires an automatic sentence. We conclude that the Legislature did not seize executive authority, so we disagree with appellant's argument.

Appellant has not offered any evidence that the Board of Pardons and Paroles ("Board") was designed to give the Board power over every prisoner. We conclude the Texas Constitution requires the Legislature to create a Board, but there is no requirement that all prisoners receive consideration for pardons or paroles. TEX. CONST. art. IV, § 11 ("The Legislature shall by law establish a Board of Pardons and Paroles and shall require it to keep record of its actions and the reasons for its actions."). Furthermore, we note that the Board retains some authority over appellant because the Board also advises the Governor on reprieves, commutations, and pardons. *Id.* at § 11(b) ("In all criminal cases, except treason and impeachment, the Governor shall have power, after conviction, on the written signed recommendation and advice of the Board of Pardons and Paroles . . . to grant reprieves and commutations of punishment and pardons . . . .").

Furthermore, the prosecutor's discretion to determine which charge to bring and prosecute is broadly construed. *Bordenkircher v. Hayes*, 434 U.S. 357, 364, 98 S.Ct. 663, 54 L.Ed.2d 604 (1978); *Neal v. State*, 150 S.W.3d 169, 173 (Tex.Crim.

App.2004). Within the confines of the legislatively created chargeable offense, the prosecutor may charge a defendant with any crime for which the prosecutor has probable cause, provided the charge was not made based upon an arbitrary classification, such as race. *Bordenkircher*, 434 U.S. at 364, 98 S.Ct. 663.

To deprive the prosecutor of his/her discretion in favor of ensuring the Board has authority to determine parole for all inmates would shift power from the judiciary to the executive branch. To do so without clear constitutional mandate would result in an inappropriate exercise of this court's authority. We decline appellant's request for this court to intervene. Appellant's fourth point of error is overruled.

## CONCLUSION

Having overruled each of appellant's points of error, we affirm the trial court judgment.