COURT OF APPEALS
 SECOND DISTRICT OF TEXAS
 FORT WORTH
  
 
 


 

 

 

NO. 02-11-00139-CR

 

 


 
 
 Michael
 O’Neal Hutchins a/k/a Michael ONeal Hutchins
  
  
 v.
  
  
  
 The
 State of Texas
 
 
 §
  
 §
  
 §
  
 §
  
 §
 
 
 From the 213th District
 Court
  
 of
 Tarrant County (1147257D)
  
 November
 21, 2012
  
 Per
 Curiam
  
 (nfp)
 
 


 

JUDGMENT

 

          This
court has considered the record on appeal in this case and holds that there was
no error in the trial court’s judgment.  It is ordered that the judgment of the
trial court is affirmed.

 

SECOND DISTRICT COURT OF APPEALS

 

 

 

PER
CURIAM

 

 


 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT OF APPEALS
 SECOND DISTRICT OF TEXAS
 FORT WORTH
  
 
 


 

 

 

NO. 02-11-00139-CR

 


 
 
 Michael O’Neal Hutchins a/k/a Michael ONeal
 Hutchins
 
 
  
 
 
 APPELLANT
 
 
 
 
  
 V.
  
 
 
 
 
 The State of Texas
 
 
  
 
 
 STATE 
 
 


 

----------

 

FROM THE 213th
District Court OF Tarrant COUNTY

----------

 

MEMORANDUM
OPINION[1]

----------

 

          Michael
O’Neal Hutchins appeals his conviction and forty-nine year sentence for
aggravated robbery.  In four points, appellant challenges the trial court’s
denial of his motion to suppress his statements during an interview with Arlington
police, contending that (1) he did not knowingly, intelligently, and
voluntarily waive his rights under Miranda, (2) he did not make an
explicit waiver of his rights under article 38.22 of the code of criminal
procedure, (3) the interrogation was a continuation of an earlier
interrogation that had begun without proper warnings under Miranda and
article 38.22, and (4) he was not aware that his earlier statements during
an unwarned interrogation were inadmissible and thus could not be used against him,
thus his subsequent waiver was not voluntary under Miranda and article
38.22.  We affirm.

Standard of Review and Applicable Law

          We
review a trial court’s ruling on a motion to suppress evidence under a
bifurcated standard of review.  Amador v. State, 221 S.W.3d 666, 673
(Tex. Crim. App. 2007); Guzman v. State, 955 S.W.2d 85, 89 (Tex. Crim.
App. 1997).  We give almost total deference to a trial court’s rulings on
questions of historical fact and application-of-law-to-fact questions that turn
on an evaluation of credibility and demeanor, but we review de novo
application-of-law-to-fact questions that do not turn on credibility and
demeanor.  Amador, 221 S.W.3d at 673; Estrada v. State, 154
S.W.3d 604, 607 (Tex. Crim. App. 2005); Johnson v. State, 68 S.W.3d 644,
652–53 (Tex. Crim. App. 2002).

It
is the State’s burden to establish a valid waiver of Miranda rights by a
preponderance of the evidence.  Leza v. State, 351 S.W.3d 344, 349 (Tex.
Crim. App. 2011).  There are two facets to any inquiry with respect to the
adequacy of a purported waiver of Miranda rights:  (1) the waiver
must be “voluntary in the sense that it was the product of a free and
deliberate choice rather than intimidation, coercion, or deception”; and (2) the
waiver must be made “with a full awareness both of the nature of the right
being abandoned and the consequences of the decision to abandon it.”  Id.
(quoting Ripkowski v. State, 61 S.W.3d 378, 384 (Tex. Crim. App. 2001), cert.
denied, 539 U.S. 916 (2003)).

Before
it may be said that a waiver of a Miranda right is involuntary, there
must be some element of official intimidation, coercion, or deception.  Id.
at 349.  And “[o]nce it is determined that a suspect[ ] . . . at
all times knew he could stand mute . . . , and that he was
aware of the State’s intention to use his statements to secure a conviction,
the analysis is complete and the waiver is valid as a matter of law.”  Moran
v. Burbine, 475 U.S. 412, 422–23, 106 S. Ct. 1135, 1141 (1986), quoted
in Leza, 351 S.W.3d at 349.  Thus, a waiver is knowing and intelligent when
the record shows that the accused has been made aware, and fully comprehends,
that he has the right to remain silent in the face of police interrogation and
to discontinue the dialogue at any time, and that the consequence of his waiver
is that his words may be used against him later in a court of law.  Leza,
351 S.W.3d at 350.

Unlike
claims of involuntary waiver of Miranda rights, claims of
involuntariness under article 38.22 of the code of criminal procedure need not
be predicated on police overreaching.  Oursbourn v. State, 259 S.W.3d
159, 172 (Tex. Crim. App. 2008).  Section 6 of that article may be construed not
only as protecting people from police overreaching but also as protecting
people from themselves.  Id.  Thus, a confession given under the duress
of hallucinations, illness, medications, or even a private threat could be
involuntary under Texas law.  Id.

Applicable Facts

Testimony at Suppression Hearing

Fort Worth police interviewed appellant, who
was a suspect in several robberies in Fort Worth.  Sometime shortly after the
interview, Fort Worth police arrested appellant on an assault charge.[2] 
While appellant was in custody as a result of the arrest, Fort Worth police contacted
Sergeant Anthony Wright with the Arlington police department, who was
investigating a robbery at a QT convenience store in Arlington.  The Fort Worth
officers told Sergeant Wright that they had received a tip which led them to
suspect that appellant had been involved in several robberies, including the QT
robbery.  Sergeant Wright then interviewed appellant starting around 9 p.m. at the
Mansfield Law Enforcement Center.  Sergeant Wright taped the interview, during
which appellant waived his Miranda rights.

Sergeant
Wright testified that he did not know how long appellant had been in custody
when he picked him up from Fort Worth and took him to Mansfield for the
interview.  Sergeant Wright did not remember what appellant was wearing, and he
did not know whether appellant had eaten, but he did say appellant did not
appear fatigued.  The interview lasted thirty minutes.

Sergeant
Wright acknowledged that he started out the interview by telling appellant that
he “had been speaking with Fort Worth, which is initially who identified”
appellant to him.  Sergeant Wright showed appellant photographs and video
stills of a couple of robberies in Arlington, including the QT one, but he did
not remember showing appellant photos or video stills of any of the Fort Worth
offenses.  When Sergeant Wright told appellant he had done an analysis of “all
the videos,” he was referring to the two Arlington robberies, but Sergeant
Wright had viewed some of the video stills from Fort Worth.  Sergeant Wright
did not know what appellant was talking about when he mentioned not knowing
about three people wearing the same clothes.  Sergeant Wright said that he
questioned appellant about the 7-11 robbery first, then the QT one, but he
could not be sure whether appellant was looking at the 7-11 and QT photos
together when he confessed to the QT robbery because all the photos were on the
table by that point.

Sergeant
Wright testified that he made no promises to appellant, did not coerce
appellant, and was not aware of any promises made by Fort Worth police; he told
appellant he did not know about the facts of the Fort Worth cases.  Sergeant
Wright did not know “anything about [Fort Worth’s] investigation.”  Sergeant
Wright admitted that appellant could have thought during the interview that
Sergeant Wright knew everything that Fort Worth police knew about robberies other
than the ones in Arlington.

Appellant
testified that in the initial Fort Worth interview, the police told him he was
under arrest but did not read him his Miranda warnings.  He thought they
told him, however, that he did not have to talk to them, but he was not sure. 
The Fort Worth interview took place the day before the interview with Sergeant
Wright.  When asked if he thought the Arlington interview was “in connection
with” the Fort Worth interview, appellant answered he did, “[s]eeing how he [Sergeant
Wright] said that he had already spoke with the . . . Fort
Worth people.”  Appellant thought his confession was going to help “somewhat”
with the Fort Worth investigation.  However, he did not think the statements he
made in the Fort Worth interview could be used against him in the Arlington
interview.  He said he thought he had to tell Sergeant Wright the same things
he told Fort Worth police.  He also “was very unsure about what was going on. 
[He] really didn’t know the concept . . . so [he] was very
unsure about the whole process.”

Appellant
said that he did not realize that he was helping to build a case against
himself when he made the waiver because the day before in Fort Worth, he was
told that if he cooperated, they would work with him and that by being honest,
they would go easy on him for punishment.  If he had realized that he would be
charged with aggravated robbery by the Arlington police, he would not have
waived his rights.

According
to appellant, Sergeant Wright did not promise him anything, but “he kind of led
[appellant] into believing that he had already spoke with Fort Worth, and that
they had been working hand in hand.”  Appellant never confessed to any of the Fort
Worth robberies, however.  He also did not believe he ever really confessed
anything to Sergeant Wright.  He said he had never been through an
interrogation before and was confused.  He said his questions to the officer
about whether he would be tried in Fort Worth or Arlington or whether he was
going back to Fort Worth show his confusion about the Arlington interview and
whether it was an extension of the Fort Worth interview.

Audiotapes

The
audiotapes of appellant’s two interviews were played for the trial court.  Appellant’s
answers in the tape of the Fort Worth interview are very difficult to
understand.  However, the officers’ questions are easier to understand, and it
is quite clear that they told appellant at the beginning of the interview that
he was not in custody and that he was free to leave at any time.  They also
said the same thing later in the interview, towards the end.[3] 
Although appellant did not admit to participating in robbing store clerks in
several cities, he did over the course of the interview admit being in the car
with two men whom the Fort Worth officers told appellant were involved in those
robberies; appellant also admitted stealing cigarettes from some of those
stores.  However, throughout the interview, appellant denied knowing about or
participating in any robberies at those same stores.[4] 
Although the police focused primarily on what appear to be Fort Worth offenses,
they did ask appellant about a 7-11 robbery in Arlington and told him they were
going to show the pictures from that store to Arlington police “in the
morning.”[5]  Throughout the
interview, Fort Worth police told appellant they knew he was one of the men in
the video and that they thought he was just making bad decisions while under
the influence of drugs.

Sergeant
Wright started his interview with appellant by telling him that he had been
working “real close with those Fort Worth guys” and that they told him
appellant had been cooperative and wanted to get all this behind him.  Sergeant
Wright then asked appellant to talk to him, read appellant his Miranda
warnings, asked if appellant would agree to talk to him, and had appellant sign
and initial a waiver card saying appellant understood his rights.  Sergeant
Wright also told appellant that he did not know what was going on in Fort
Worth, that he was not there to discuss it with appellant, and that it was none
of his business.

Sergeant
Wright asked appellant about robberies at a QT and a 7-11 in Arlington. 
Although he showed appellant pictures, we cannot tell which stores were shown
in the pictures.  Sergeant Wright did tell appellant that based on the pictures
appellant had looked at in Fort Worth (and had identified himself in), Sergeant
Wright thought appellant was the person who robbed the clerks in Arlington.  Appellant
admitted that the man in Sergeant Wright’s pictures could have been him, but he
told Sergeant Wright he was not sure if he had ever been in those stores. 
Appellant identified his companion, Dre, in a picture when appellant and
Sergeant Wright were discussing the 7-11 robbery.

When
appellant did not say whether he had participated in the QT robbery, Sergeant
Wright told him he knew the man in the picture was him.  Sergeant Wright told
appellant that the clerk at the QT had identified him but that the clerk at the
7-11 could not.  According to Sergeant Wright, there was no question that the
man in the QT picture was appellant because the clerk could clearly see his
face.

Sergeant
Wright said he wanted to know why “they” had picked the QT and whether
appellant intended to kill or hurt the clerk.  In response to that question, about
halfway through the interview, appellant said the gun was not loaded; he also told
Sergeant Wright that Dre had dropped him off at the store, and he did not know
why Dre picked certain stores.  This was the first time in the interview with
Sergeant Wright in which appellant admitted participating in the robberies.  Sergeant
Wright also told appellant that the clerk at the QT was distraught over the
robbery and feared for his life.  Sergeant Wright told appellant he wanted to
be able to tell the clerk that the robbers did not intend to kill him, and
appellant affirmed that he did not.

By
the end of the interview, appellant had admitted his involvement in both
offenses.  Sergeant Wright thanked appellant for his cooperation and said that
he would be able to reassure the QT clerk that the men did not intend to kill
him that night and were not going to retaliate against him or his family. 
Sergeant Wright then asked appellant for a saliva sample for DNA testing; when
appellant expressed confusion, Sergeant Wright told appellant he was not
required to provide a sample voluntarily.  After Sergeant Wright read appellant
the consent form for the sample, and appellant acquiesced verbally, appellant asked
what would happen if he waited until he had an attorney to find out what was
the best thing to do.  Sergeant Wright told appellant he was free to consult an
attorney before giving a DNA sample.  Appellant then referred to the Fort Worth
interview, and Sergeant Wright again explained to appellant that the Fort Worth
offenses were separate and that he was interested only in the Arlington
offenses.  Upon appellant’s questioning about who would be responsible for
prosecuting him, Sergeant Wright explained that Tarrant County would be
responsible for prosecuting all of the cases and that they would probably be
handled by one DA.

Findings

The trial court made the following oral
findings on the record:

Article 38.22 of the
Texas Code of . . . Criminal Procedure was complied with.  The
Defendant was read his Miranda rights by Sergeant Wright.  The Defendant . . . initialed
the card -- the warning card which contained the Miranda warning.  Specifically,
he was warned that he had the right to remain silent, not make any statements
at all.  And any statement he make -- may make would -- may be used against him
at trial.  Any statements you may make may be used as evidence against you in
court.

 

He was advised, “You
have the right to have a lawyer present to advise you prior to and during any questioning.
 If you are unable to employ a lawyer, you have the right to have a lawyer
appointed to advise you prior to and during any questioning.  You have the
right to terminate the interview at any time.”

 

The statement given
by the Defendant was given to Officer Wright. This was recorded.  The Miranda
warning was recorded by Officer Wright also.  The Defendant knowingly,
intelligently, and voluntarily waived any rights set out in the motion.  The
statement was recorded by a recording device that was capable of making an
accurate recording, and I believe it was competent.  And the recording is
accurate and has not been altered. Voices on the recording were identified.

 

The Defendant was not
promised anything as -- in order to induce him to make a statement.  No threats
were made to the Defendant, no promises. It was a completely voluntar[]y
statement made by Defendant.

 

The Court also finds
that the Defendant did not confess to Fort Worth police, and that he was not in . . . custody
at the time because he was not under arrest.  But in any event, no statement
was made by Defendant at that time.

 

But the Court finds
that in its totality, the action of officer -- or Sergeant Wright complied with
38.22; therefore, the Court will overrule your objection.  State’s Exhibit 5
will be -- which is the unredacted copy, will be admitted for record purposes only.
 State’s Exhibit 6 will be admitted to the jury for all purposes. . . .

 

Analysis

Miranda

Appellant does not contend that he was denied
access to outside resources or physical needs, that he was in any physical or
mental discomfort, or that Sergeant Wright made any promises or threats to
coerce the confession.  Appellant’s main contention is that he thought the
interview with Sergeant Wright was merely a continuation of his prior, unwarned
interview with Fort Worth police; as such, he did not realize what he was doing
when he waived his rights during the interview with Sergeant Wright because he
had already spoken with Fort Worth police by that point and had not been warned
during that interview. In other words, appellant contends that he thought
Sergeant Wright would have found out what appellant told Fort Worth regardless
of whether he talked with him, so his waiver was meaningless. 

Although
appellant contends that he was in custody during the Fort Worth interview and,
thus, that he should have received Miranda warnings, the trial court
believed that appellant was not in custody and that warnings were not required.

There
are at least four general situations when a suspect’s detention may constitute
custody:  (1) when the suspect is physically deprived of his freedom of
action in any significant way, (2) when a law enforcement officer tells
the suspect that he cannot leave, (3) when law enforcement officers create
a situation that would lead a reasonable person to believe that his freedom of
movement has been significantly restricted, and (4) when there is probable
cause to arrest and law enforcement officers do not tell the suspect that he is
free to leave.  Dowthitt v. State, 931 S.W.2d 244, 255 (Tex. Crim. App.
1996); McCulley v. State, 352 S.W.3d 107, 115–16 (Tex. App.––Fort Worth
2011, pet. ref’d).  In the first through third situations, the restriction upon
freedom of movement must amount to the degree associated with an arrest as
opposed to an investigative detention.  Dowthitt, 931 S.W.2d at 255; McCulley,
352 S.W.3d at 116.  Concerning the fourth situation, the officers’ knowledge of
probable cause must be manifested to the subject, and such manifestation could
occur if information sustaining the probable cause is related by the officers
to the suspect or by the suspect to the officers.  Dowthitt, 931 S.W.2d
at 255; McCulley, 352 S.W.3d at 116.  Situation four, however, will not
automatically establish custody; rather, custody is established if the
manifestation of probable cause, combined with other circumstances, would lead
a reasonable person to believe that he is under restraint to the degree
associated with an arrest.  Dowthitt, 931 S.W.2d at 255; McCulley,
352 S.W.3d at 116.  Additionally, the length of time involved is an important
factor to consider in determining whether a custodial interrogation occurred.  Dowthitt,
931 S.W.2d at 256; McCulley, 352 S.W.3d at 116.

The
Fort Worth interview took about three hours.  The audiotape of that interview
shows that the police told appellant more than once that he was free to leave
and that he was not in custody.  The trial court was thus justified in not
believing appellant’s testimony that the police told him he was under arrest. 
After the interview, the Fort Worth police did not arrest appellant for any
robberies; instead, they arrested him for assault.  Thus, the record supports
the trial court’s finding and conclusion that appellant was not in the custody
of, or under arrest by, the Fort Worth police during that interview and that, therefore,
Miranda warnings were not required.  See Estrada v. State, 313
S.W.3d 274, 294–95 (Tex. Crim. App. 2010), cert. denied, 131 S. Ct. 905
(2011).

Moreover,
the trial court believed Sergeant Wright’s testimony, borne out by the
recording, that he made it “extremely clear” to appellant before the interview
started that he was an Arlington police officer and was investigating two Arlington
crimes.  The two interviews were under different circumstances:  one was
voluntary with Fort Worth police; the other occurred after appellant had already
been arrested by Fort Worth police, and Sergeant Wright had to transport him to
the Mansfield detention center.  Even if the trial court believed that the Fort
Worth officers’ statements to appellant in their interview indicating that they
believed he was in a bad situation and had not intended to hurt anyone amounted
to promises of leniency with respect to the Fort Worth crimes, there is still
no evidence that Sergeant Wright promised, or that appellant thought, that he
would be granted leniency regarding the Arlington crimes.  See Muniz v.
State, 851 S.W.2d 238, 254 (Tex. Crim. App.) (“Before a promise will render
a confession inadmissible, it must be shown that the promise induced the
confession. . . .  In order to induce the confession, the
promise must be (1) positive, (2) made or sanctioned by someone in
authority, and (3) of such an influential nature that a defendant would
speak untruthfully in response thereto.” (citation omitted)), cert. denied,
510 U.S. 837 (1993); Wilson v. State, 348 S.W.3d 32, 39 (Tex. App.—Houston
[14th Dist.] 2011, pet. ref’d) (holding that appellant could not demonstrate
that statements by sergeant would have induced an innocent person to confess). 
Additionally, the trial court determined that, despite appellant’s contention
that he was confused, the totality of the circumstances showed that Sergeant
Wright’s explicit warnings, along with appellant’s answers, were sufficient to show
that appellant was aware of his rights and the consequences of waiving them.  See
Joseph v. State, 309 S.W.3d 20, 27 (Tex. Crim. App. 2010).

Likewise,
there is no evidence that, in appellant’s words, “[t]he procedure used by the
State was designed to circumvent [a]ppellant’s constitutional and statutory
protections.”  The recordings show that appellant provided progressively more
information as the interviews proceeded.  Although he had been arrested by the
time of the Arlington interview, he nevertheless initially and repeatedly denied
to Sergeant Wright that he had been involved in the Arlington robberies.  Only
at the suggestion that the gun used in the robberies was loaded, however—about
halfway through the interview[6]—did appellant decide to
talk; once he did so, he appeared to be “in for a penny, in for a pound.” 
Accordingly, viewed under the appropriate standard of review, the trial court’s
ruling that appellant’s confession was knowing, intelligent, and voluntary for
purposes of Miranda was not error.  We overrule appellant’s first point.

Article 38.22

Appellant argues that the short time between
the two interviews shows that he thought they were connected; thus, he did not
understand the warnings Sergeant Wright gave him because he thought Sergeant
Wright already knew everything the Fort Worth police knew and that he had to
tell Sergeant Wright the same things he told Fort Worth.  But appellant’s
initial and repeated refusal to answer Sergeant Wright’s questions was not consistent
with the answers he gave Fort Worth police during their interview.  Appellant
knew that Fort Worth police had arrested him on an assault charge, not a
robbery or aggravated robbery charge.  And although Sergeant Wright started his
interview by saying he had talked to and worked with the Fort Worth police, he
clearly told appellant he was concerned only about crimes committed in
Arlington.  Moreover, this statement occurred after Sergeant Wright
Mirandized appellant and appellant signed the waiver card.  The record does not
support appellant’s contention that he did not know what he was doing when he
signed the waiver card and spoke to Sergeant Wright about the QT robbery in
Arlington.  See Leza, 351 S.W.3d at 352–53.  We overrule appellant’s second
point.

Coordinated Continuation of Unwarned Fort
Worth Interview

In his third and fourth points, appellant
contends that the trial court erred by denying his motion to suppress because
the interview with Sergeant Wright was a continuation of an earlier, unwarned, custodial
interview with Fort Worth police and appellant was therefore unaware that those
earlier statements were inadmissible and could not be used against him.  Appellant
did not argue at trial that Fort Worth police deliberately failed to Mirandize
him to coerce a confession to the Arlington aggravated robbery.  Although
appellant testified on voir dire that Fort Worth police told him he was not
free to leave, the court listened to an excerpt from the beginning of that
interview.  Appellant’s counsel admitted in her argument on the motion to
suppress that Fort Worth police had told him he did not have to talk to them
and was free to terminate the interview.  Instead, she argued that appellant
was confused about the effect of the prior interview when he was confronted
with Sergeant Wright’s warning; counsel contended that appellant thought
Sergeant Wright was working with the Fort Worth police and, thus, that Sergeant
Wright should have disabused appellant of any misperceptions he had regarding
the effect of that voluntary interview.  Accordingly, we conclude and hold that
appellant failed to preserve his third and fourth points, in which he contends
that Sergeant Wright and Fort Worth police used a “coordinated and continuing”
interrogation procedure that was “designed to circumvent” appellant’s rights.[7] 
See Tex. R. App. P. 33.1(a)(1); Romo v. State, 315 S.W.3d 565,
573 n.7 (Tex. App.—Fort Worth 2010, pet. ref’d); see also Missouri v.
Seibert, 542 U.S. 600, 608, 124 S. Ct. 2601, 2608 (2004); Carter v. State,
309 S.W.3d 31, 38 (Tex. Crim. App. 2010).  We overrule his third and fourth points.

Conclusion

Having overruled appellant’s four points, we
affirm the trial court’s judgment.

 

PER CURIAM

 

PANEL:  LIVINGSTON, C.J.; GARDNER and GABRIEL, JJ.

 

GARDNER and GABRIEL, JJ., concur without
opinion.

 

DO NOT PUBLISH

Tex. R. App.
P. 47.2(b)

 

DELIVERED: 
November 21, 2012









[1]See Tex. R. App. P. 47.4.





[2]It is unclear when Fort
Worth police arrested appellant, but it was sometime between the time of their
interview, which ended around 10:30 p.m. February 13, 2009, and 9 p.m. the next
day.  The evidence does not show what the assault charge was for, but appellant
admitted during his interview with the Fort Worth police that he had recently
been in a fight.





[3]One of the officers did
tell appellant that he was in “some trouble.”





[4]Although appellant
initially denied knowing that at least one of the men had a gun, he later
admitted he knew one of them, Dre, had a gun with him.





[5]They also asked about a
robbery on Grapevine Highway, but they did not identify the city.  From the
officers’ questioning, it appears that these robberies involved similar
methodology and occurred around the same time.





[6]The Arlington interview
lasted about thirty minutes.





[7]Appellant’s counsel did
argue the “cat-out-of-the-bag” theory, but the thrust of that argument was that
appellant did not understand that he was not in custody during the Fort Worth
interview and that even though he did not confess during that interview, he
thought Fort Worth police must know he was the culprit and had shared that
information with Sergeant Wright.  See Griffin v. State, 765 S.W.2d 422,
425, 427 (Tex. Crim. App. 1989).