

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 02-09-00222-CR

MARK ALAN MCCULLEY                                                    APPELLANT

V.

THE STATE OF TEXAS                                                          STATE

------------

### FROM THE 89TH DISTRICT COURT OF WICHITA COUNTY

------------

## OPINION

------------

## I. INTRODUCTION

Appellant Mark Alan McCulley appeals his conviction for murder. In two points, McCulley contends that the trial court erred by determining that he was not in custody at the time he made incriminating statements to the police and by determining that he did not invoke his right to terminate the interview. Because we hold that the police cured their failure to timely advise McCulley of his rights, and because we hold that McCulley never unambiguously invoked his right to terminate the interview, we will affirm.

## II. BACKGROUND

McCulley called the police on the night of May 20, 2007. When police arrived at his house, McCulley was covered in blood and his wife had been stabbed. The police took McCulley to the hospital, where an ambulance transported his wife, who later died. The police extensively photographed McCulley. From there, McCulley accompanied the police to the police station, where the police questioned him for almost four and one-half hours. McCulley eventually implicated himself in his wife's death. Before trial, McCulley filed a motion to suppress the statement he made to police. The trial court held a suppression hearing.

At the suppression hearing, the State called Detective Kelly Brunson of the City of Wichita Falls Police Department to testify. Brunson testified that he was trained in conducting interviews for the police department. He averred that he also had been trained regarding *Miranda* warnings and the warnings contained in Texas Code of Criminal Procedure article 38.22. According to Brunson, his sergeant called him on the night of May 20, 2007. The sergeant sent Brunson to the hospital to "view the body and to speak to [] McCulley." After McCulley consented to the search of his house, Brunson said that he asked McCulley to go to the police station so that he could interview him. Brunson testified that McCulley obliged and that another officer brought McCulley to the police station. He also said that McCulley was not a suspect at this time and that the interview was intended to "gather leads and any intelligence he might have to try to find out

2

what happened." Brunson said that the videotaped interview began shortly before 1:00 a.m. on May 21.

Brunson said that as he interviewed McCulley, he had McCulley verify to him that he was there of his own free will, and Brunson said that McCulley freely answered his questions. Brunson testified, as the video of the interview played for the trial court, that after asking McCulley, "is there anything that you haven't talked about that might help me out on this case, anything at all that might help me, " McCulley responded, "I just want to see her," and "I just want to go to the hospital." After telling McCulley that his wife "was still at the hospital," Brunson told McCulley that he could see her "as soon as we finish here."

Brunson said that during the interview, he reminded McCulley that he was still free to leave: "I was just making sure that he understood that he was there on his own free will, that he wasn't under arrest and he wasn't charged with any offense." Brunson testified that his specific statement was "You're here under your own free will, you still understand that, right?" McCulley responded, "I would like to go to the hospital." Brunson responded, "Even if we let you go to the hospital, . . . I don't know if we would let you see your wife right away," and "Now's probably not a good time to see her." When asked what would have happened if McCulley had gone to the hospital, Brunson said, "I wouldn't have let him see her [body]."

Brunson testified that after asking to go to the hospital, McCulley asked, "Can I go home?" Brunson responded that the police were still at his house and

3

that he could take him there as soon as they were finished. As the interview continued, Brunson said that another detective stepped into the interview room. Brunson explained to the other detective that McCulley wanted to see his wife and that Brunson had told McCulley it probably wasn't a "good idea at this time." The detective responded that she did not think it was a good idea for McCulley to see his wife and also that the police would be at his home for some time. McCulley asked again, "Can I go home?" He was told again that it was not a good idea. Brunson said that what the detective meant when she said that the police would be at McCulley's home for a while was that the police would be processing crime-scene evidence and no one would be allowed in the home. Brunson said that even after these requests, McCulley was not a suspect at this time and that he was still free to leave the interview.

By Brunson's account, if McCulley were to leave the police station, an officer "would have transported him." Brunson acknowledged that McCulley was not wearing shoes. Brunson said that McCulley's transportation "would have been up to me." An hour into the interview, Brunson asked McCulley whether he had committed the murder. Later, Brunson explained to McCulley that the person closest to the victim is often the suspect in a murder. Brunson maintained that for the majority of the nearly four and one-half hour interview, McCulley was free to leave at any time but that to leave would have required Brunson's assistance because "it's . . . kind of a sneaky way out." When asked

4

directly how McCulley would have left the police station, Brunson said, "I would have to had shown him the way out."

Brunson said that just before 5:00 a.m., he and McCulley read McCulley's *Miranda* rights and his article 38.22 rights together. Brunson averred that McCulley acknowledged that he understood his rights. When asked whether he was still willing to talk to Brunson, McCulley responded, "Can I just go to sleep?" Brunson responded, "We need to talk. We need to get things worked out." He told McCulley, "You can go to sleep when we're done." But Brunson also said, "If you want to invoke your rights, that's your right also." McCulley said, "I'll talk to you," and signed a waiver that he understood his rights and that he was talking to the police voluntarily. According to Brunson, he did not have probable cause to arrest McCulley even at this juncture, but McCulley "was becoming a focus of the investigation." At that time, another detective entered the room, and McCulley said, in response to the detective's question about how he was doing, that he was not doing well because he was being charged with murder. The detective responded that McCulley was not actually being charged at this time. But Brunson did testify that at this time, McCulley was no longer free to leave. The trial court denied McCulley's motion to suppress.

The video of the interview reflects many of the statements Brunson testified to. In the video, as the interview begins, Brunson tells McCulley that he is not under arrest and is not being charged with anything. Brunson also has McCulley verify that he knows he is there of his own free will. It is clear that

5

McCulley is not wearing shoes. Less than thirty minutes into the interview, the questions by the detectives primarily concern McCulley's timeline of events. McCulley's initial story is that his wife had left earlier that day, that he was watching a movie, and that his stomach got upset during the movie, so he went for a walk. When he arrived home from his walk, he discovered his wife lying on the living room floor, bleeding. According to McCulley's initial story, she asked for his help and declared that she was dying.

Brunson asks McCulley about previous physical altercations with his wife and a prior record of violence with her. Brunson asks several questions about why McCulley was not wearing shoes, what shoes he wore when he allegedly went for a walk during the movie, and when and where he took them off. Brunson physically examines McCulley by looking at the bottoms of his feet, looking at his hands, and lifting up his shirt and examining his torso. Brunson questions McCulley about cuts on his hands. Each time McCulley asks to go home or to the hospital, Brunson's responses, although couched in terms of that not being a "good idea" or not "right now," were statements suggesting that McCulley could eventually go to those places, but not during the time the interview was being conducted. At one moment, McCulley asks "when" he can go to the hospital. Brunson responds, "[A]s soon as we finish here." Later, when McCulley asks to go home, Brunson responds similarly with, "[W]e can take you there when we get finished."

6

Multiple times during the interview, Brunson asks McCulley whether things had gotten "out of hand," and "[D]id you do this?," and he tells McCulley that the person closest to the victim is usually the suspect. Multiple detectives ask McCulley about the whereabouts of a particular knife. Multiple detectives also state to McCulley that his timeline does not make sense.

In the interview, two detectives other than Brunson also question McCulley. The first of the two question him before he was ever given any warnings. She asks him about violence in his relationship. The detective also tells McCulley that, according to his timeline, he would have been leaving the movie during its climactic moment. She tells him directly that his timeline does not make sense. After almost four hours, Brunson and McCulley read McCulley's *Miranda* and article 38.22 warnings together. McCulley eventually states that he had "killed her" and had thrown the knife in a neighboring yard.

The State introduced McCulley's videotaped statement at trial, and a jury found him guilty of murder. The jury also found that McCulley acted in the heat of passion. *See* Tex. Penal Code Ann. § 19.02 (West 2011). McCulley was sentenced to twenty years' incarceration. This appeal followed.

### III. CUSTODY AND THE ADMISSIBILITY OF MCCULLEY'S STATEMENT

In his first point, McCulley contends that the trial court erred by determining that he was not in custody at any time during his nearly four and one-half hour interview with the police. McCulley does not contend in his brief that the trial court should have granted his motion to suppress his statement made to police

7

because he was in custody. But because that is the logical extension of his argument, we assume that he intended to argue that his statement should have been suppressed.

## A.    Custody

The prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S. Ct. 1602, 1612 (1966). Additionally, article 38.22 of the code of criminal procedure precludes the use of statements that result from custodial interrogation without compliance with its procedural safeguards. *See* Tex. Code Crim. Proc. Ann. art. 38.22 (West 2005) (providing that no statement made as a result of a custodial interrogation shall be admissible against the accused in a criminal proceeding unless, among other things, prior to the giving of the statement, the statutory warnings are administered to the accused).

Custodial interrogation is questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way. *Miranda*, 384 U.S. at 444, 86 S. Ct. at 1612. If an investigation is not at an accusatorial or custodial stage, a person's Fifth Amendment rights have not yet come into play, and the voluntariness in waiving those rights is not implicated. *Melton v. State*, 790 S.W.2d 322, 326 (Tex. Crim. App. 1990).

8

Four factors are relevant to determining whether a person is in custody: (1) probable cause to arrest, (2) subjective intent of the police, (3) focus of the investigation, and (4) subjective belief of the defendant. *Dowthitt v. State*, 931 S.W.2d 244, 254 (Tex. Crim. App. 1996). Factors two and four have become irrelevant except to the extent that they may be manifested in the words or actions of police officers; the custody determination is based entirely upon objective circumstances. *Id.*; *see also Stansbury v. California*, 511 U.S. 318, 322–23, 114 S. Ct. 1526, 1528–29 (1994). Simply becoming the focus of the investigation does not necessarily equate to custody for purposes of determining whether a statement is voluntarily given. *Meek v. State*, 790 S.W.2d 618, 621 (Tex. Crim. App. 1990).

As a general rule, when a person voluntarily accompanies law enforcement to a certain location, even though he knows or should know that law enforcement suspects that he may have committed or may be implicated in committing a crime, that person is not restrained or "in custody." *Livingston v. State*, 739 S.W.2d 311, 327 (Tex. Crim. App. 1987), *cert. denied*, 487 U.S. 1210 (1988). More specifically, so long as the circumstances show that a person is acting only upon the invitation, request, or even urging of law enforcement, and there are no threats, either express or implied, that he will be taken forcibly, the accompaniment is voluntary, and such person is not in custody. *Anderson v. State*, 932 S.W.2d 502, 505 (Tex. Crim. App. 1996), *cert. denied*, 521 U.S. 1122 (1997). But the mere fact that an interrogation begins as noncustodial does not

9

prevent custody from arising later; police conduct during the encounter may cause a consensual inquiry to escalate into custodial interrogation. *Ussery v. State*, 651 S.W.2d 767, 770 (Tex. Crim. App. 1983).

There are at least four general situations when a suspect's detention may constitute custody: (1) when the suspect is physically deprived of his freedom of action in any significant way, (2) when a law enforcement officer tells the suspect that he cannot leave, (3) when law enforcement officers create a situation that would lead a reasonable person to believe that his freedom of movement has been significantly restricted, and (4) when there is probable cause to arrest[1] and law enforcement officers do not tell the suspect that he is free to leave. *Dowthitt*, 931 S.W.2d at 255. In the first through third situations, the restriction upon freedom of movement must amount to the degree associated with an arrest as opposed to an investigative detention. *Id.* (*citing Stansbury*, 511 U.S. at 322–23, 114 S. Ct. at 1528–29). Concerning the fourth situation, the officers' knowledge of probable cause must be manifested to the subject, and such manifestation could occur if information sustaining the probable cause is related by the officers to the suspect or by the suspect to the officers. *Id.*; *see Ruth v. State*, 645 S.W.2d 432, 436 (Tex. Crim. App. [Panel Op.] 1979) (holding that a suspect's "statement that he had shot the victim immediately focused the investigation on

---

[1]Probable cause to arrest exists when, at that moment, the facts and circumstances within the knowledge of the arresting officer and of which he has reasonably trustworthy information would warrant a reasonable and prudent man in believing that a particular person has committed or is committing a crime. *Jones v. State*, 493 S.W.2d 933, 935 (Tex. Crim. App. 1973).

10

him and furnished probable cause to believe that he had committed an offense[;] [a]fter that time, the continued interrogation must be considered a custodial one"). Situation four, however, will not automatically establish custody; rather, custody is established if the manifestation of probable cause, combined with other circumstances, would lead a reasonable person to believe that he is under restraint to the degree associated with an arrest. *Dowthitt*, 931 S.W.2d at 255. Additionally, the length of time involved is an important factor to consider in determining whether a custodial interrogation occurred. *Id.* at 256.

Here, according to Brunson, McCulley voluntarily rode with an officer to the police station from the hospital. Brunson's testimony is the only evidence at the suppression hearing regarding McCulley's ride to the police station. This testimony indicates that McCulley was not in custody when the interview at the police station began. *Miller v. State*, 196 S.W.3d 256, 266 (Tex. App.—Fort Worth 2006, pet. ref'd) (reasoning that appellant's choice to voluntarily meet police at a location demonstrated that police encounter was initially noncustodial). McCulley, however, was not wearing shoes and had blood on his clothing. At the suppression hearing, Brunson testified that in order for McCulley to return home or to the hospital, the police would have needed to transport him. When asked whether McCulley was dependent upon the police for transportation, Brunson answered, "It would have been up to me." Brunson also averred that leaving the interrogation room would have been difficult, requiring knowledge of a "sneaky way out," so much so that Brunson said more than once

11

that he would have been required to escort McCulley out of the building. When taken as a whole, we conclude that McCulley was physically deprived of his freedom in a significant way.

And even though the police never directly told McCulley that he could not leave, a reasonable person in McCulley's situation would have believed that his freedom of movement had been significantly restricted. Each time McCulley indicated a desire to go to the hospital or his home, the police indicated that he could not go to those places until the police were "finished." Furthermore, the police possessed probable cause that McCulley had committed the murder, and Brunson expressed this directly to McCulley several times during questioning. The questioning in the video reflects an interview primarily focused on McCulley. His version of his timeline was the subject of most of the questions asked by multiple police officers. Regarding McCulley's statement that he had been on a walk only to come home and find that his wife had been stabbed, Brunson asked McCulley several questions about his lack of shoes and when he had taken them off. Brunson asked McCulley multiple times, "Did you do this?," and if things had gotten "out of hand." Brunson also examined McCulley's hands, asked about cuts on his fingers, examined the bottoms of his feet, and even had him raise up his shirt to physically examine his torso. McCulley had already been photographed in this same manner at the hospital before he went to the interrogation room. Multiple police officers directed questions to McCulley that focused on the murder weapon.

12

At one point, Brunson explained to McCulley that the person closest to the victim was a natural suspect. McCulley responded "I'm probably in trouble." This statement later served as one of Brunson's transitions back to questioning McCulley about his timeline and about whether McCulley had been the one who stabbed his wife. McCulley was also told directly that his timeline did not make sense, and detectives asked him why he would leave the movie he was watching at such a climactic moment. Again, all of these questions were framed by McCulley's questions about when he could go home or to the hospital, and each time those requests were rebuffed with statements indicating that McCulley could not go to either of those places and, moreover, could not leave until the officers were finished questioning him. Police finally read McCulley his rights almost four hours after they brought him to the interrogation room. *See Dowthitt*, 931 S.W.2d at 255–56 (reasoning that the length of time involved is an important factor to consider in determining whether a custodial interrogation occurred). We conclude that McCulley was in custody and the focus of the police's investigation well before 4:55 a.m., when police finally read McCulley his *Miranda* and article 38.22 warnings. *See id.*, 931 S.W.2d at 254 (holding that a suspect being the focus of police investigation is a relevant factor in determining whether suspect is in custody). But our analysis does not end with this conclusion.

### B.    McCulley's Custodial Statement

The real question in McCulley's first point is whether the trial court erred by overruling his motion to suppress his statement that was the result of custodial

13

interrogation without the benefit of police timely providing him with *Miranda* and article 38.22 warnings.

### 1. Standard of Review

We review a trial court's ruling on a motion to suppress evidence under a bifurcated standard of review. *Amador v. State*, 221 S.W.3d 666, 673 (Tex. Crim. App. 2007); *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). We give almost total deference to a trial court's rulings on questions of historical fact and application-of-law-to-fact questions that turn on an evaluation of credibility and demeanor, but we review de novo application-of-law-to-fact questions that do not turn on credibility and demeanor. *Amador*, 221 S.W.3d at 673; *Estrada v. State*, 154 S.W.3d 604, 607 (Tex. Crim. App. 2005); *Johnson v. State*, 68 S.W.3d 644, 652-53 (Tex. Crim. App. 2002).

### 2. Midstream *Miranda* Warnings

Generally, the failure to give timely *Miranda* warnings[2] results in the prosecution being required to forfeit the use of any statement obtained during that interrogation during its case-in-chief. *Missouri v. Seibert*, 542 U.S. 600, 608, 124 S. Ct. 2601, 2608 (2004); *Martinez*, 272 S.W.3d at 620. But not every

---

[2]The seminal cases analyzing midstream *Miranda* warnings all use the same analysis to determine the subsequent effectiveness of both *Miranda* and article 38.22 warnings. *See Carter v. State*, 309 S.W.3d 31, 36 (Tex. Crim. App. 2010) (analyzing midstream *Miranda* warnings and article 38.22 warnings with singular analysis); *see also Martinez v. State*, 272 S.W.3d 615, 622–23 (Tex. Crim. App. 2008) (same); *Ervin v. State*, 333 S.W.3d 187, 213–14 (Tex. App.—Houston [1st Dist.] 2010, pet. ref'd), *cert. denied*, --- S. Ct. ----, No. 10-9555, 2011 WL 999357 at *1 (U.S. June 13, 2011) (same).

14

violation of *Miranda* requires suppression of the evidence obtained; evidence is admissible when the central concerns of *Miranda* are not likely to be implicated and when other objectives of the criminal justice system are best served by its introduction. *Martinez*, 272 S.W.3d at 624 (citing *Seibert*, 542 U.S. at 618–19, 124 S. Ct. at 2614) (Kennedy, J., concurring). A suspect who has once responded to unwarned yet uncoercive questioning is not thereby disabled from waiving his rights and confessing after he has been given the requisite *Miranda* warnings. *Oregon v. Elstad*, 470 U.S. 298, 318, 105 S. Ct. 1285, 1297–98 (1985). The central question when determining the admissibility of post-*Miranda* warning confessions made after *Miranda* violations is whether the evidence shows that the officer deliberately employed a two-step "question first, warn later" interrogation technique to circumvent the suspect's *Miranda* protections. *Carter*, 309 S.W.3d at 36. This is so because when the warnings are inserted in the midst of coordinated and continuing interrogation, they are likely to mislead and deprive a defendant of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them. *Martinez*, 272 S.W.3d at 626, n.20 (citing *Moran v. Burbine*, 475 U.S. 412, 423–24, 106 S. Ct. 1135, 1142 (1986)). When a question-first interrogation begins, it cannot be known whether the suspect will incriminate himself, but the suspect's rights as set out in *Miranda* have already been violated. *Martinez*, 272 S.W.3d at 624. And it is immaterial whether incriminating statements emerged from the unwarned portion of the interrogation. *Id.* If a deliberate two-step question-first strategy has been

15

used, post-*Miranda* statements that are related to the substance of pre-*Miranda* statements must be excluded unless curative measures are taken before the post-Miranda statements are made. *Id.* at 626–27. No curative steps were taken in this case.

Here, police should have given McCulley his *Miranda* and article 38.22 warnings at the moment his interview turned from an investigation to an interrogation. Therefore, we must determine whether the police deliberately employed a two-step question-first strategy in an effort to thwart McCulley's understanding of his rights.

### 3. No Deliberate Tactic by Police to Undermine *Miranda*

The standard of review for a trial court's finding of an officer's subjective deliberateness in the "question first, warn later" *Miranda* context is that the finding shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses. *Carter*, 309 S.W.3d at 38–39. Because the "question of whether the interrogating officer deliberately withheld *Miranda* warnings will invariably turn on the credibility of the officer's testimony in light of the totality of the circumstances surrounding the interrogation," a factual finding regarding the officer's credibility is entitled to deference on appeal and is reviewed only for clear error. *Id.* at 39.

Here, the trial court made the specific finding of fact at the suppression hearing that Brunson was a credible witness. Brunson testified that he did not believe that McCulley was in custody at any time during the interview. Because

16

the question of whether Brunson deliberately withheld warnings turns on his credibility and because the trial court determined he was in fact credible, we defer to the trial court's determination. Based on the trial court's credibility determination, the record does not show a deliberate tactic to employ a two-step interrogation technique. We hold that the record fails to show that the police deliberately used a two-step, "question first, warn later" strategy. *See Carter*, 309 S.W.3d at 36; *see also Ervin*, 333 S.W.3d at 213–14) ("Because the trial court found credible the officers' testimony that appellant was not in custody . . . even if the officers erred in their belief that she was not in custody, that error does not amount to a deliberate tactic to circumvent *Miranda*.").

### 4. McCulley's Statement was Admissible

When the two-step questioning tactic is not deliberately employed, "the admissibility of any subsequent statement should turn . . . solely on whether it is knowingly and voluntarily made." *Elstad*, 470 U.S. at 309, 105 S. Ct. at 1293; *Carter*, 309 S.W.3d at 32. Thus, the factfinder must examine all of the circumstances and the course of police conduct in evaluating the voluntariness of those post-*Miranda* statements. *Carter*, 309 S.W.3d at 41. We must give great deference "to the trial judge's decision to admit or exclude such evidence, which will be overturned on appeal only where a flagrant abuse of discretion is shown." *Id.* at 42; *see United States v. Stewart*, 536 F.3d 714, 723 (7th Cir. 2008) (stating that when the interrogation process used was not a deliberate end run around *Miranda*, a trial court should determine "whether the initial unwarned confession

17

would flunk the voluntariness standard of *Elstad* such that the taint would carry over to the second warned confession").

In this case, the trial judge made specific findings that McCulley's post-*Miranda* statement to police was voluntarily made. We find that the record and reasonable inferences from that record support this finding. Brunson administered appropriate *Miranda* and article 38.22 warnings prior to McCulley's statement that he had killed his wife. In the video of the interview, McCulley repeatedly said that he understood his rights and was willing to talk to the police. Thus, predicated on the legal conclusion that it was voluntarily made, we agree with the trial judge that McCulley's statement was admissible. *See Carter*, 309 S.W.3d at 37 (holding that trial court's finding that defendant's statement was voluntarily made supported trial court's admission of statement despite mid-*Miranda* warning). We overrule McCulley's first point.

### IV. MCCULLEY'S RIGHT TO TERMINATE THE INTERVIEW

In his second point, McCulley contends that the police did not honor his request to remain silent or to terminate the interview.

### A. Standard of Review

An appellate court should afford almost total deference to a trial court's determination of the historical facts that the record supports, especially when the trial court's fact findings are based on an evaluation of credibility and demeanor. *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997); *Hollingsworth v. State*, 15 S.W.3d 586, 591 (Tex. App.—Austin 2000, no pet.). Appellate courts

18

should give the same amount of deference to a trial court's rulings on "application of law to fact questions," also known as "mixed questions of law and fact," if the resolution of those ultimate questions turns on an evaluation of credibility and demeanor. *Guzman*, 955 S.W.2d at 89; *Hargrove v. State*, 162 S.W.3d 313, 318 (Tex. App.—Fort Worth 2005, pet. ref'd). Appellate courts review de novo "mixed questions of law and fact" not falling within this category. *Guzman*, 955 S.W.2d at 89; *Hargrove*, 162 S.W.3d at 318. At the hearing on a motion to suppress, the trial court is the sole trier of fact and judge of the witnesses' credibility and the weight to be given their testimony. *Ramirez v. State*, 44 S.W.3d 107, 109 (Tex. App.—Austin 2001, no pet.). The trial judge may choose to believe or disbelieve any or all of a witness's testimony. *Id.*

### B.     Invoking the Right to Remain Silent

The Fifth Amendment privilege against self-incrimination is protected during custodial interrogation by certain procedural safeguards delineated in *Miranda*. 384 U.S. at 444, 86 S. Ct. at 1612. These "safeguards" have been codified in the Texas Code of Criminal Procedure. *See* Tex. Code Crim. Proc. Ann. art. 38.22. Within these principles, the right to terminate a custodial interrogation is a "critical safeguard" of the right to remain silent. *See Michigan v. Mosley*, 423 U.S. 96, 103, 96 S. Ct. 321, 326 (1975). No formal invocation of this right is necessary. *Watson v. State*, 762 S.W.2d 591, 597 (Tex. Crim. App. 1988). If the suspect indicates "in any manner" that he invokes the right to remain silent, the interrogation must stop. *Miranda*, 384 U.S. at 473–74, 86

19

S. Ct. at 1627. But any indication that the suspect wishes to remain silent must be unambiguous, and interrogating officers are not required to clarify wishes that are ambiguous. *Dowthitt*, 931 S.W.2d at 257. An officer's failure to stop custodial interrogation after an unambiguous invocation of the right to remain silent renders any later obtained statements inadmissible. *Id.*

"Of course, when a suspect makes an ambiguous or equivocal statement it will often be good police practice for the interviewing officers to clarify whether or not he actually wants" to terminate the questioning. *Davis v. U.S.*, 512 U.S. 452, 461, 114 S. Ct. 2350, 2356 (1994). The officer is not, however, required to ask clarifying questions, and if the suspect's statement is not an unambiguous or unequivocal request to terminate the interview or to invoke the right to silence, the officers have no obligation to stop questioning him. *Davis*, 512 U.S. at 461–62, 114 S. Ct. 2356; *Ramos v. State*, 245 S.W.3d 410, 418 (Tex. Crim. App. 2008). In determining whether the right to remain silent was unambiguously invoked, courts look to the totality of the circumstances. *Williams*, 257 S.W.3d at 433 (Tex. App.—Austin 2008, pet. ref'd).

Here, McCulley contends that his questions about whether he could go to the hospital or go home, coupled with his statements that he wanted to "go to sleep," were sufficient to invoke his right to terminate the interview. But none of these statements constitute an unambiguous and unequivocal invocation of the right to remain silent or otherwise terminate the interview. And each time, Brunson followed the statements with clarifying remarks of his own. In fact, when

20

McCulley ultimately told Brunson, "I just want to go to sleep," Brunson did not simply ignore the statement and continue questioning. Instead, Brunson sought to clarify McCulley's wishes before continuing the interview. *See Marshall v. State*, 210 S.W.3d 618, 628 (Tex. Crim. App. 2006), *cert. denied*, 552 U.S. 847 (2007) (stating that federal constitutional law does not prohibit officer from clarifying whether arrestee wished to waive right to remain silent); *Williams v. State*, 257 S.W.3d at 432 (same). Brunson even told McCulley, "If you want to invoke your rights, that's your right, also." McCulley replied, "I'll talk to you." Giving due deference to the factfinder's credibility determinations, we conclude that the trial court did not abuse its discretion by overruling the motion to suppress as pertaining to any right to remain silent and admitting McCulley's statement. *See Dowthitt*, 931 S.W.2d at 257 (holding that appellant's statement, "I can't say more than that. I need to rest," was ambiguous and indicated only that appellant believed that he was physically unable to continue); *Hargrove*, 162 S.W.3d at 319 (holding that accused's statement that he wanted to "terminate it" was ambiguous and did not require the officer to stop questioning); *Franks v. State*, 90 S.W.3d 771, 786–87 (Tex. App.—Fort Worth 2002, no pet.) (holding defendant's statement, "I don't want to talk anymore. I'm tired," was ambiguous, and his rights were not violated by the continuation of the interrogation). We overrule McCulley's second point.

21

## V. Conclusion

Having overruled both of McCulley's points, we affirm the trial court's judgment.


BILL MEIER
JUSTICE

PANEL:  WALKER, MEIER, and GABRIEL, JJ.

PUBLISH

DELIVERED:  August 18, 2011

22