

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

### NO. 02-11-00139-CR

| | | |
|---|---|---|
| Michael O'Neal Hutchins a/k/a Michael ONeal Hutchins | § | From the 213th District Court |
| | § | of Tarrant County (1147257D) |
| v. | § | November 21, 2012 |
| | § | Per Curiam |
| The State of Texas | § | (nfp) |

## JUDGMENT

This court has considered the record on appeal in this case and holds that there was no error in the trial court's judgment. It is ordered that the judgment of the trial court is affirmed.

SECOND DISTRICT COURT OF APPEALS

PER CURIAM



# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH

### NO. 02-11-00139-CR

MICHAEL O'NEAL HUTCHINS                                    APPELLANT
A/K/A MICHAEL ONEAL HUTCHINS

V.

THE STATE OF TEXAS                                              STATE

----------

### FROM THE 213TH DISTRICT COURT OF TARRANT COUNTY

----------

## MEMORANDUM OPINION[1]

----------

Michael O'Neal Hutchins appeals his conviction and forty-nine year sentence for aggravated robbery. In four points, appellant challenges the trial court's denial of his motion to suppress his statements during an interview with Arlington police, contending that (1) he did not knowingly, intelligently, and voluntarily waive his rights under *Miranda*, (2) he did not make an explicit waiver of his rights under article 38.22 of the code of criminal procedure, (3) the

---

[1]*See* Tex. R. App. P. 47.4.

interrogation was a continuation of an earlier interrogation that had begun without proper warnings under *Miranda* and article 38.22, and (4) he was not aware that his earlier statements during an unwarned interrogation were inadmissible and thus could not be used against him, thus his subsequent waiver was not voluntary under *Miranda* and article 38.22.  We affirm.

## Standard of Review and Applicable Law

We review a trial court's ruling on a motion to suppress evidence under a bifurcated standard of review.  *Amador v. State*, 221 S.W.3d 666, 673 (Tex. Crim. App. 2007); *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). We give almost total deference to a trial court's rulings on questions of historical fact and application-of-law-to-fact questions that turn on an evaluation of credibility and demeanor, but we review de novo application-of-law-to-fact questions that do not turn on credibility and demeanor.  *Amador*, 221 S.W.3d at 673; *Estrada v. State*, 154 S.W.3d 604, 607 (Tex. Crim. App. 2005); *Johnson v. State*, 68 S.W.3d 644, 652–53 (Tex. Crim. App. 2002).

It is the State's burden to establish a valid waiver of *Miranda* rights by a preponderance of the evidence.  *Leza v. State*, 351 S.W.3d 344, 349 (Tex. Crim. App. 2011).  There are two facets to any inquiry with respect to the adequacy of a purported waiver of *Miranda* rights:  (1) the waiver must be "voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception"; and (2) the waiver must be made "with a full awareness both of the nature of the right being abandoned and the

3

consequences of the decision to abandon it." *Id.* (quoting *Ripkowski v. State*, 61 S.W.3d 378, 384 (Tex. Crim. App. 2001), *cert. denied*, 539 U.S. 916 (2003)).

Before it may be said that a waiver of a *Miranda* right is involuntary, there must be some element of official intimidation, coercion, or deception. *Id.* at 349. And "[o]nce it is determined that a suspect[ ] . . . at all times knew he could stand mute . . . , and that he was aware of the State's intention to use his statements to secure a conviction, the analysis is complete and the waiver is valid as a matter of law." *Moran v. Burbine*, 475 U.S. 412, 422–23, 106 S. Ct. 1135, 1141 (1986), *quoted in Leza*, 351 S.W.3d at 349. Thus, a waiver is knowing and intelligent when the record shows that the accused has been made aware, and fully comprehends, that he has the right to remain silent in the face of police interrogation and to discontinue the dialogue at any time, and that the consequence of his waiver is that his words may be used against him later in a court of law. *Leza*, 351 S.W.3d at 350.

Unlike claims of involuntary waiver of *Miranda* rights, claims of involuntariness under article 38.22 of the code of criminal procedure need not be predicated on police overreaching. *Oursbourn v. State*, 259 S.W.3d 159, 172 (Tex. Crim. App. 2008). Section 6 of that article may be construed not only as protecting people from police overreaching but also as protecting people from themselves. *Id.* Thus, a confession given under the duress of hallucinations, illness, medications, or even a private threat could be involuntary under Texas law. *Id.*

4

## Applicable Facts

### Testimony at Suppression Hearing

Fort Worth police interviewed appellant, who was a suspect in several robberies in Fort Worth. Sometime shortly after the interview, Fort Worth police arrested appellant on an assault charge.[2] While appellant was in custody as a result of the arrest, Fort Worth police contacted Sergeant Anthony Wright with the Arlington police department, who was investigating a robbery at a QT convenience store in Arlington. The Fort Worth officers told Sergeant Wright that they had received a tip which led them to suspect that appellant had been involved in several robberies, including the QT robbery. Sergeant Wright then interviewed appellant starting around 9 p.m. at the Mansfield Law Enforcement Center. Sergeant Wright taped the interview, during which appellant waived his *Miranda* rights.

Sergeant Wright testified that he did not know how long appellant had been in custody when he picked him up from Fort Worth and took him to Mansfield for the interview. Sergeant Wright did not remember what appellant was wearing, and he did not know whether appellant had eaten, but he did say appellant did not appear fatigued. The interview lasted thirty minutes.

---

[2]It is unclear when Fort Worth police arrested appellant, but it was sometime between the time of their interview, which ended around 10:30 p.m. February 13, 2009, and 9 p.m. the next day. The evidence does not show what the assault charge was for, but appellant admitted during his interview with the Fort Worth police that he had recently been in a fight.

5

Sergeant Wright acknowledged that he started out the interview by telling appellant that he "had been speaking with Fort Worth, which is initially who identified" appellant to him. Sergeant Wright showed appellant photographs and video stills of a couple of robberies in Arlington, including the QT one, but he did not remember showing appellant photos or video stills of any of the Fort Worth offenses. When Sergeant Wright told appellant he had done an analysis of "all the videos," he was referring to the two Arlington robberies, but Sergeant Wright had viewed some of the video stills from Fort Worth. Sergeant Wright did not know what appellant was talking about when he mentioned not knowing about three people wearing the same clothes. Sergeant Wright said that he questioned appellant about the 7-11 robbery first, then the QT one, but he could not be sure whether appellant was looking at the 7-11 and QT photos together when he confessed to the QT robbery because all the photos were on the table by that point.

Sergeant Wright testified that he made no promises to appellant, did not coerce appellant, and was not aware of any promises made by Fort Worth police; he told appellant he did not know about the facts of the Fort Worth cases. Sergeant Wright did not know "anything about [Fort Worth's] investigation." Sergeant Wright admitted that appellant could have thought during the interview that Sergeant Wright knew everything that Fort Worth police knew about robberies other than the ones in Arlington.

6

Appellant testified that in the initial Fort Worth interview, the police told him he was under arrest but did not read him his *Miranda* warnings. He thought they told him, however, that he did not have to talk to them, but he was not sure. The Fort Worth interview took place the day before the interview with Sergeant Wright. When asked if he thought the Arlington interview was "in connection with" the Fort Worth interview, appellant answered he did, "[s]eeing how he [Sergeant Wright] said that he had already spoke with the . . . Fort Worth people." Appellant thought his confession was going to help "somewhat" with the Fort Worth investigation. However, he did not think the statements he made in the Fort Worth interview could be used against him in the Arlington interview. He said he thought he had to tell Sergeant Wright the same things he told Fort Worth police. He also "was very unsure about what was going on. [He] really didn't know the concept . . . so [he] was very unsure about the whole process."

Appellant said that he did not realize that he was helping to build a case against himself when he made the waiver because the day before in Fort Worth, he was told that if he cooperated, they would work with him and that by being honest, they would go easy on him for punishment. If he had realized that he would be charged with aggravated robbery by the Arlington police, he would not have waived his rights.

According to appellant, Sergeant Wright did not promise him anything, but "he kind of led [appellant] into believing that he had already spoke with Fort Worth, and that they had been working hand in hand." Appellant never

7

confessed to any of the Fort Worth robberies, however. He also did not believe he ever really confessed anything to Sergeant Wright. He said he had never been through an interrogation before and was confused. He said his questions to the officer about whether he would be tried in Fort Worth or Arlington or whether he was going back to Fort Worth show his confusion about the Arlington interview and whether it was an extension of the Fort Worth interview.

**Audiotapes**

The audiotapes of appellant's two interviews were played for the trial court. Appellant's answers in the tape of the Fort Worth interview are very difficult to understand. However, the officers' questions are easier to understand, and it is quite clear that they told appellant at the beginning of the interview that he was not in custody and that he was free to leave at any time. They also said the same thing later in the interview, towards the end.[3] Although appellant did not admit to participating in robbing store clerks in several cities, he did over the course of the interview admit being in the car with two men whom the Fort Worth officers told appellant were involved in those robberies; appellant also admitted stealing cigarettes from some of those stores. However, throughout the interview, appellant denied knowing about or participating in any robberies at those same stores.[4] Although the police focused primarily on what appear to be

[3]One of the officers did tell appellant that he was in "some trouble."

[4]Although appellant initially denied knowing that at least one of the men had a gun, he later admitted he knew one of them, Dre, had a gun with him.

8

Fort Worth offenses, they did ask appellant about a 7-11 robbery in Arlington and told him they were going to show the pictures from that store to Arlington police "in the morning."[5] Throughout the interview, Fort Worth police told appellant they knew he was one of the men in the video and that they thought he was just making bad decisions while under the influence of drugs.

Sergeant Wright started his interview with appellant by telling him that he had been working "real close with those Fort Worth guys" and that they told him appellant had been cooperative and wanted to get all this behind him. Sergeant Wright then asked appellant to talk to him, read appellant his *Miranda* warnings, asked if appellant would agree to talk to him, and had appellant sign and initial a waiver card saying appellant understood his rights. Sergeant Wright also told appellant that he did not know what was going on in Fort Worth, that he was not there to discuss it with appellant, and that it was none of his business.

Sergeant Wright asked appellant about robberies at a QT and a 7-11 in Arlington. Although he showed appellant pictures, we cannot tell which stores were shown in the pictures. Sergeant Wright did tell appellant that based on the pictures appellant had looked at in Fort Worth (and had identified himself in), Sergeant Wright thought appellant was the person who robbed the clerks in Arlington. Appellant admitted that the man in Sergeant Wright's pictures could

---

[5]They also asked about a robbery on Grapevine Highway, but they did not identify the city. From the officers' questioning, it appears that these robberies involved similar methodology and occurred around the same time.

9

have been him, but he told Sergeant Wright he was not sure if he had ever been in those stores. Appellant identified his companion, Dre, in a picture when appellant and Sergeant Wright were discussing the 7-11 robbery.

When appellant did not say whether he had participated in the QT robbery, Sergeant Wright told him he knew the man in the picture was him. Sergeant Wright told appellant that the clerk at the QT had identified him but that the clerk at the 7-11 could not. According to Sergeant Wright, there was no question that the man in the QT picture was appellant because the clerk could clearly see his face.

Sergeant Wright said he wanted to know why "they" had picked the QT and whether appellant intended to kill or hurt the clerk. In response to that question, about halfway through the interview, appellant said the gun was not loaded; he also told Sergeant Wright that Dre had dropped him off at the store, and he did not know why Dre picked certain stores. This was the first time in the interview with Sergeant Wright in which appellant admitted participating in the robberies. Sergeant Wright also told appellant that the clerk at the QT was distraught over the robbery and feared for his life. Sergeant Wright told appellant he wanted to be able to tell the clerk that the robbers did not intend to kill him, and appellant affirmed that he did not.

By the end of the interview, appellant had admitted his involvement in both offenses. Sergeant Wright thanked appellant for his cooperation and said that he would be able to reassure the QT clerk that the men did not intend to kill him that

10

night and were not going to retaliate against him or his family. Sergeant Wright then asked appellant for a saliva sample for DNA testing; when appellant expressed confusion, Sergeant Wright told appellant he was not required to provide a sample voluntarily. After Sergeant Wright read appellant the consent form for the sample, and appellant acquiesced verbally, appellant asked what would happen if he waited until he had an attorney to find out what was the best thing to do. Sergeant Wright told appellant he was free to consult an attorney before giving a DNA sample. Appellant then referred to the Fort Worth interview, and Sergeant Wright again explained to appellant that the Fort Worth offenses were separate and that he was interested only in the Arlington offenses. Upon appellant's questioning about who would be responsible for prosecuting him, Sergeant Wright explained that Tarrant County would be responsible for prosecuting all of the cases and that they would probably be handled by one DA.

**Findings**

The trial court made the following oral findings on the record:

Article 38.22 of the Texas Code of . . . Criminal Procedure was complied with. The Defendant was read his Miranda rights by Sergeant Wright. The Defendant . . . initialed the card -- the warning card which contained the Miranda warning. Specifically, he was warned that he had the right to remain silent, not make any statements at all. And any statement he make -- may make would -- may be used against him at trial. Any statements you may make may be used as evidence against you in court.

He was advised, "You have the right to have a lawyer present to advise you prior to and during any questioning. If you are unable to employ a lawyer, you have the right to have a lawyer appointed to

11

advise you prior to and during any questioning. You have the right to terminate the interview at any time."

The statement given by the Defendant was given to Officer Wright. This was recorded. The Miranda warning was recorded by Officer Wright also. The Defendant knowingly, intelligently, and voluntarily waived any rights set out in the motion. The statement was recorded by a recording device that was capable of making an accurate recording, and I believe it was competent. And the recording is accurate and has not been altered. Voices on the recording were identified.

The Defendant was not promised anything as -- in order to induce him to make a statement. No threats were made to the Defendant, no promises. It was a completely voluntar[]y statement made by Defendant.

The Court also finds that the Defendant did not confess to Fort Worth police, and that he was not in . . . custody at the time because he was not under arrest. But in any event, no statement was made by Defendant at that time.

But the Court finds that in its totality, the action of officer -- or Sergeant Wright complied with 38.22; therefore, the Court will overrule your objection. State's Exhibit 5 will be -- which is the unredacted copy, will be admitted for record purposes only. State's Exhibit 6 will be admitted to the jury for all purposes. . . .

**Analysis**

*Miranda*

Appellant does not contend that he was denied access to outside resources or physical needs, that he was in any physical or mental discomfort, or that Sergeant Wright made any promises or threats to coerce the confession. Appellant's main contention is that he thought the interview with Sergeant Wright was merely a continuation of his prior, unwarned interview with Fort Worth police; as such, he did not realize what he was doing when he waived his rights during

12

the interview with Sergeant Wright because he had already spoken with Fort Worth police by that point and had not been warned during that interview. In other words, appellant contends that he thought Sergeant Wright would have found out what appellant told Fort Worth regardless of whether he talked with him, so his waiver was meaningless.

Although appellant contends that he was in custody during the Fort Worth interview and, thus, that he should have received *Miranda* warnings, the trial court believed that appellant was not in custody and that warnings were not required.

There are at least four general situations when a suspect's detention may constitute custody: (1) when the suspect is physically deprived of his freedom of action in any significant way, (2) when a law enforcement officer tells the suspect that he cannot leave, (3) when law enforcement officers create a situation that would lead a reasonable person to believe that his freedom of movement has been significantly restricted, and (4) when there is probable cause to arrest and law enforcement officers do not tell the suspect that he is free to leave. *Dowthitt v. State*, 931 S.W.2d 244, 255 (Tex. Crim. App. 1996); *McCulley v. State*, 352 S.W.3d 107, 115–16 (Tex. App.––Fort Worth 2011, pet. ref'd). In the first through third situations, the restriction upon freedom of movement must amount to the degree associated with an arrest as opposed to an investigative detention. *Dowthitt*, 931 S.W.2d at 255; *McCulley*, 352 S.W.3d at 116. Concerning the fourth situation, the officers' knowledge of probable cause must be manifested to

the subject, and such manifestation could occur if information sustaining the probable cause is related by the officers to the suspect or by the suspect to the officers. *Dowthitt*, 931 S.W.2d at 255; *McCulley*, 352 S.W.3d at 116. Situation four, however, will not automatically establish custody; rather, custody is established if the manifestation of probable cause, combined with other circumstances, would lead a reasonable person to believe that he is under restraint to the degree associated with an arrest. *Dowthitt*, 931 S.W.2d at 255; *McCulley*, 352 S.W.3d at 116. Additionally, the length of time involved is an important factor to consider in determining whether a custodial interrogation occurred. *Dowthitt*, 931 S.W.2d at 256; *McCulley*, 352 S.W.3d at 116.

The Fort Worth interview took about three hours. The audiotape of that interview shows that the police told appellant more than once that he was free to leave and that he was not in custody. The trial court was thus justified in not believing appellant's testimony that the police told him he was under arrest. After the interview, the Fort Worth police did not arrest appellant for any robberies; instead, they arrested him for assault. Thus, the record supports the trial court's finding and conclusion that appellant was not in the custody of, or under arrest by, the Fort Worth police during that interview and that, therefore, *Miranda* warnings were not required. *See Estrada v. State*, 313 S.W.3d 274, 294–95 (Tex. Crim. App. 2010), *cert. denied*, 131 S. Ct. 905 (2011).

Moreover, the trial court believed Sergeant Wright's testimony, borne out by the recording, that he made it "extremely clear" to appellant before the

14

interview started that he was an Arlington police officer and was investigating two Arlington crimes. The two interviews were under different circumstances: one was voluntary with Fort Worth police; the other occurred after appellant had already been arrested by Fort Worth police, and Sergeant Wright had to transport him to the Mansfield detention center. Even if the trial court believed that the Fort Worth officers' statements to appellant in their interview indicating that they believed he was in a bad situation and had not intended to hurt anyone amounted to promises of leniency with respect to the Fort Worth crimes, there is still no evidence that Sergeant Wright promised, or that appellant thought, that he would be granted leniency regarding the Arlington crimes. *See Muniz v. State*, 851 S.W.2d 238, 254 (Tex. Crim. App.) ("Before a promise will render a confession inadmissible, it must be shown that the promise induced the confession. . . . In order to induce the confession, the promise must be (1) positive, (2) made or sanctioned by someone in authority, and (3) of such an influential nature that a defendant would speak untruthfully in response thereto." (citation omitted)), *cert. denied*, 510 U.S. 837 (1993); *Wilson v. State*, 348 S.W.3d 32, 39 (Tex. App.—Houston [14th Dist.] 2011, pet. ref'd) (holding that appellant could not demonstrate that statements by sergeant would have induced an innocent person to confess). Additionally, the trial court determined that, despite appellant's contention that he was confused, the totality of the circumstances showed that Sergeant Wright's explicit warnings, along with appellant's answers, were sufficient to show that appellant was aware of his

15

rights and the consequences of waiving them. *See Joseph v. State*, 309 S.W.3d 20, 27 (Tex. Crim. App. 2010).

Likewise, there is no evidence that, in appellant's words, "[t]he procedure used by the State was designed to circumvent [a]ppellant's constitutional and statutory protections." The recordings show that appellant provided progressively more information as the interviews proceeded. Although he had been arrested by the time of the Arlington interview, he nevertheless initially and repeatedly denied to Sergeant Wright that he had been involved in the Arlington robberies. Only at the suggestion that the gun used in the robberies was loaded, however—about halfway through the interview[6]—did appellant decide to talk; once he did so, he appeared to be "in for a penny, in for a pound." Accordingly, viewed under the appropriate standard of review, the trial court's ruling that appellant's confession was knowing, intelligent, and voluntary for purposes of *Miranda* was not error. We overrule appellant's first point.

**Article 38.22**

Appellant argues that the short time between the two interviews shows that he thought they were connected; thus, he did not understand the warnings Sergeant Wright gave him because he thought Sergeant Wright already knew everything the Fort Worth police knew and that he had to tell Sergeant Wright the same things he told Fort Worth. But appellant's initial and repeated refusal to

---

[6]The Arlington interview lasted about thirty minutes.

16

answer Sergeant Wright's questions was not consistent with the answers he gave Fort Worth police during their interview. Appellant knew that Fort Worth police had arrested him on an assault charge, not a robbery or aggravated robbery charge. And although Sergeant Wright started his interview by saying he had talked to and worked with the Fort Worth police, he clearly told appellant he was concerned only about crimes committed in Arlington. Moreover, this statement occurred *after* Sergeant Wright Mirandized appellant and appellant signed the waiver card. The record does not support appellant's contention that he did not know what he was doing when he signed the waiver card and spoke to Sergeant Wright about the QT robbery in Arlington. *See Leza*, 351 S.W.3d at 352–53. We overrule appellant's second point.

**Coordinated Continuation of Unwarned Fort Worth Interview**

In his third and fourth points, appellant contends that the trial court erred by denying his motion to suppress because the interview with Sergeant Wright was a continuation of an earlier, unwarned, *custodial* interview with Fort Worth police and appellant was therefore unaware that those earlier statements were inadmissible and could not be used against him. Appellant did not argue at trial that Fort Worth police deliberately failed to Mirandize him to coerce a confession to the Arlington aggravated robbery. Although appellant testified on voir dire that Fort Worth police told him he was not free to leave, the court listened to an excerpt from the beginning of that interview. Appellant's counsel admitted in her argument on the motion to suppress that Fort Worth police had told him he did

17

not have to talk to them and was free to terminate the interview. Instead, she argued that appellant was confused about the effect of the prior interview when he was confronted with Sergeant Wright's warning; counsel contended that appellant thought Sergeant Wright was working with the Fort Worth police and, thus, that Sergeant Wright should have disabused appellant of any misperceptions he had regarding the effect of that voluntary interview. Accordingly, we conclude and hold that appellant failed to preserve his third and fourth points, in which he contends that Sergeant Wright and Fort Worth police used a "coordinated and continuing" interrogation procedure that was "designed to circumvent" appellant's rights.[7] *See* Tex. R. App. P. 33.1(a)(1); *Romo v. State*, 315 S.W.3d 565, 573 n.7 (Tex. App.—Fort Worth 2010, pet. ref'd); *see also Missouri v. Seibert*, 542 U.S. 600, 608, 124 S. Ct. 2601, 2608 (2004); *Carter v. State*, 309 S.W.3d 31, 38 (Tex. Crim. App. 2010). We overrule his third and fourth points.

---

[7]Appellant's counsel did argue the "cat-out-of-the-bag" theory, but the thrust of that argument was that appellant did not understand that he was not in custody during the Fort Worth interview and that even though he did not confess during that interview, he thought Fort Worth police must know he was the culprit and had shared that information with Sergeant Wright. *See Griffin v. State*, 765 S.W.2d 422, 425, 427 (Tex. Crim. App. 1989).

## Conclusion

Having overruled appellant's four points, we affirm the trial court's judgment.

PER CURIAM

PANEL:  LIVINGSTON, C.J.; GARDNER and GABRIEL, JJ.

GARDNER and GABRIEL, JJ., concur without opinion.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED:  November 21, 2012