02-11-511-CR












 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT OF APPEALS
 SECOND DISTRICT OF TEXAS
 FORT WORTH
  
 
 


 

 

NO.
02-11-00511-CR

 

 


 
 
 Raymond
 Charles White
  
  
  
 v.
  
  
  
 The
 State of Texas
 
 
 §
  
 §
  
 §
  
 §
  
 §
 
 
 From
 the 371st District Court
  
 of
 Tarrant County (1230480D)
  
 February
 21, 2013
  
 Opinion
 by Justice Walker
  
 (p)
 
 


 

JUDGMENT

 

         
This court has considered the record on appeal in this case and holds that
there was error in part of the trial court’s judgment.  It is ordered that
the judgment of the trial court is vacated and dismissed in part and affirmed
in part.  We vacate and dismiss the trial court’s judgment on count two
and affirm the trial court’s judgment on count one. 

SECOND DISTRICT COURT OF APPEALS 

 

 

 

By_________________________________

   
Justice Sue Walker

 

 

 


 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT OF APPEALS
 SECOND DISTRICT OF TEXAS
 FORT WORTH
  
 
 


 

 

NO.
02-11-00511-CR

 

 


 
 
 Raymond Charles White
 
 
  
 
 
 APPELLANT
 
 
 
 
  
 V.
  
 
 
 
 
 The State of Texas
 
 
  
 
 
 STATE
 
 


 

 

----------

FROM THE 371st District Court OF Tarrant COUNTY

----------

OPINION

----------

I. Introduction

Appellant
Raymond Charles White appeals his convictions for burglary of a habitation with
intent to commit sexual assault (count one) and burglary of a habitation with
intent to commit assault (count two).  In five issues, he
argues that his convictions violate double jeopardy, that the trial court erred
by denying his motion to suppress and his motion for mistrial, and that the
trial court’s charge on guilt-innocence was erroneous.  We will vacate and
dismiss the trial court’s judgment on count two as violative
of double jeopardy and affirm the conviction for count one.

II.  Factual and
Procedural Background

         
Claire Buckholz and her six-year-old son were asleep
in her bed in her Fort Worth house one night.  She awoke to the sound of
strange noises around 4:30 a.m.  She opened her eyes and saw a man wearing
dark clothing with a hoodie pulled over his head standing in the doorway of her
bedroom.  She screamed. The man jumped on top of Buckholz and punched her several times.  When he began
choking her, she bit his finger as hard as she could.  He punched her in
the face again.  The man told Buckholz’s son to
go to his room, but he would not leave his mother.  The man began pulling
off Buckholz’s pajama bottoms, and she stopped him by
telling him that she had herpes.  As the man was leaving, he took Buckholz’s cell phone.  Buckholz
and her son ran to the neighbor’s house and called 911. 
   

         
Fort Worth police traced Buckholz’s cell phone
activity to a house in southwest Fort Worth.  Detective Felicia Cleveland
went to that house and recovered the phone from Fernando Ruis,
who said he got it from his son-in-law.  The detective spoke to the
son-in-law, as well as several other individuals who had possessed the phone,
and ultimately traced it back to White.  Police located White at a nearby
park.   

         
Detectives Cleveland and Sullivan went to the park to speak to White. 
They told him that they wanted to talk to him about a stolen cell phone and
asked if he would go with them to the police station for questioning. 
They saw a band-aid on White’s finger.  White
agreed, but he asked to call his grandmother, whom he lived with, first. 
After calling his grandmother, White left with the detectives.  They told
him that he was not being arrested and that they would take him back to his
grandmother’s house after the interview.    

During
the videotaped interview, which lasted about one hour, White initially denied
burglarizing Buckholz’s home.  He said he had
cut his finger while watching a television program.  White then admitted
to going into Buckholz’s bedroom, putting his hand
over her mouth to keep her from screaming, and taking her cell phone.  He
also admitted that Buckholz bit him.  He denied
attempting to sexually assault her.  The detectives took photographs of
the cut on White’s finger.  After the interview, the police returned White
to his grandmother’s house.  Police then obtained an arrest warrant and
arrested him at the park about an hour and a half later. 

         
Buckholz’s pajama bottoms tested positive for
blood.  DNA testing of the blood on the pajama bottoms revealed that White
was a major contributor to the mixture.      

White
was indicted for one count of burglary of a habitation with intent to commit sexual
assault and one count of burglary of a habitation with intent to commit
assault.  See Tex. Penal Code Ann. § 30.02(a), (c)(2),
(d)(2) (West 2011).  The State did not introduce evidence of White’s
confession during its case-in-chief.  After the defense called White’s
grandmother to testify that White had been at home the night of the burglary,
the State on rebuttal introduced evidence of White’s confession.  

A
jury convicted White of both counts, and after the jury was unable to reach a unanimous
verdict on punishment, the trial court granted a mistrial on punishment.
 After a new trial on punishment before a new jury, the jury assessed
White’s punishment at eighteen years’ confinement on each count.  The
trial court sentenced him accordingly, ordering that the sentences run
concurrently.  

III.  Double Jeopardy
Violation

         
In
his second issue, White argues that his convictions of two counts of burglary
of a habitation violated double jeopardy when only one offense of burglary of a
habitation was committed.  The State concedes that convicting White of two
counts of burglary arising from the same act was a double jeopardy
violation.  See Ex parte Cavazos, 203 S.W.3d 333, 336–37
(Tex. Crim. App. 2006) (holding that convictions for burglary of habitation
with intent to commit theft and burglary of habitation with intent to commit
sexual assault for same entry violated double jeopardy because the allowable
unit of prosecution was the unlawful entry).  Thus, we will address
the appropriate remedy, that is, which of the two offenses should be vacated
and dismissed and which should be retained as the “most serious offense.” See id. at
338.

When
a defendant has been prosecuted and convicted in a single criminal action of
two or more offenses that constitute the same offense, in violation of double
jeopardy, the remedy is to apply “the most serious offense” test and retain the
conviction for the “most serious” offense.  Id.  The “most
serious” offense is the offense for which the greatest sentence was
assessed.  Id. (overruling Landers v. State, 957 S.W.2d 558,
559–60 (Tex. Crim. App. 1997), which held that other factors—such as the degree
of the felony, range of punishment, and rules governing parole eligibility and
awarding of good-conduct time—should be used in that determination); see
also Evans v. State, 299 S.W.3d 138, 141 (Tex. Crim. App. 2009); Bigon v. State, 252 S.W.3d 360, 372–73 (Tex.
Crim. App. 2008).

But
when, as here, the punishment for each conviction is identical, we cannot look to
only the sentences imposed to determine the most serious offense.  See
Bigon, 252 S.W.3d at 373. 
In Bigon, faced with a situation similar to
the one here, the court of criminal appeals looked at the degree of each
offense in determining the most serious offense:

Only because the
sentences are identical do we have to look to another
criteria for determining which offense is the most serious.  In
this case, we look to the degree of felony for each offense.  While the
sentences assessed for each of the convictions on this case is the same, felony
murder is a first-degree felony, while intoxication manslaughter and
manslaughter are second-degree felonies.  As such, felony murder is
clearly the most serious offense and we affirm the court of appeals’ decision
to retain this conviction.

 

Id.[1] 


White
urges a percentage-of-maximum-possible-punishment approach to determining which
of the two offenses is the most serious in this case.  He argues that the
most serious offense is the burglary of a habitation with intent to commit
assault (count two) because the eighteen-year sentence assessed by the jury for
that count is approximately ninety percent of the maximum twenty-year
imprisonment sentence for a second-degree felony.  See Tex. Penal
Code Ann. § 12.33(a) (West 2011) (providing range of imprisonment between two
and twenty years as second-degree-felony punishment).  White points out
that, in contrast, the eighteen-year sentence assessed by the
jury for count one is only one-fifth of the maximum imprisonment
sentence for burglary of a habitation with intent to commit sexual assault, a
first-degree felony.  See id. § 12.32(a)
(West 2011) (providing range of imprisonment between five and ninety-nine years
or life as first-degree-felony punishment).  White argues that,
consequently, “this jury saw the offense alleged in ‘Count Two’ as the more
serious of the two.”[2]   

But
following our court of criminal appeals’ precedent, as we must, we will look to
the degree of felony for the two offenses to determine the “most serious”
offense.  See Bigon, 252 S.W.3d at 373.  Because burglary of a habitation
with intent to commit sexual assault is a first-degree felony and burglary of a
habitation with intent to commit assault is a second-degree felony, see Tex.
Penal Code Ann. § 30.02(c)(2), (d)(2), count one—burglary with intent to commit
sexual assault—is the most serious offense here.  See id.  We
will vacate White’s conviction for count two (burglary of a habitation with
intent to commit assault).  See id.; see also Tex. R.
App. P. 43.2(e).  We sustain White’s second issue in part and, to the
extent he requests we vacate his conviction for count one, overrule it in part.[3]

 

IV.  Motion to Suppress

         
In his first issue, White complains that the trial court erred by denying his
motion to suppress evidence of his confession because it was obtained in
violation of Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602 (1966),
and because the detectives’ promises rendered the confession involuntary.

A. 
Standard of Review

         
We review a trial court’s ruling on a motion to suppress evidence under a
bifurcated standard of review.  Amador v. State,
221 S.W.3d 666, 673 (Tex. Crim. App. 2007); Guzman v. State, 955 S.W.2d
85, 89 (Tex. Crim. App. 1997).  In reviewing the trial court’s
decision, we do not engage in our own factual review.  Romero
v. State, 800 S.W.2d 539, 543 (Tex. Crim. App. 1990); Best v. State,
118 S.W.3d 857, 861 (Tex. App.—Fort Worth 2003, no pet.).  The
trial judge is the sole trier of fact and judge of the credibility of the
witnesses and the weight to be given their testimony.  Wiede v. State, 214
S.W.3d 17, 24–25 (Tex. Crim. App. 2007); State v. Ross, 32 S.W.3d 853,
855 (Tex. Crim. App. 2000), modified on other grounds by State v. Cullen,
195 S.W.3d 696 (Tex. Crim. App. 2006).  Therefore, we give almost
total deference to the trial court’s rulings on (1) questions of
historical fact, even if the trial court’s determination of those facts was not
based on an evaluation of credibility and demeanor, and
(2) application-of-law-to-fact questions that turn on an evaluation of
credibility and demeanor.  Amador, 221 S.W.3d at
673; Montanez v. State, 195 S.W.3d 101, 108–09 (Tex. Crim. App. 2006); Johnson
v. State, 68 S.W.3d 644, 652–53 (Tex. Crim. App. 2002).  But
when application-of-law-to-fact questions do not turn on the credibility and
demeanor of the witnesses, we review the trial court’s rulings on those questions
de novo.  Amador, 221 S.W.3d at 673; Estrada
v. State, 154 S.W.3d 604, 607 (Tex. Crim. App. 2005); Johnson, 68
S.W.3d at 652–53.

         
Stated another way, when reviewing the trial court’s ruling on a motion to
suppress, we must view the evidence in the light most favorable to the trial
court’s ruling.  Wiede, 214 S.W.3d at 24; State v. Kelly, 204 S.W.3d 808, 818
(Tex. Crim. App. 2006).  When the record is silent on the reasons
for the trial court’s ruling, or when there are no explicit fact findings and
neither party timely requested findings and conclusions from the trial court,
we imply the necessary fact findings that would support the trial court’s
ruling if the evidence, viewed in the light most favorable to the trial court’s
ruling, supports those findings.  State v. Garcia-Cantu, 253 S.W.3d
236, 241 (Tex. Crim. App. 2008); see Wiede,
214 S.W.3d at 25.  We then review the trial court’s legal ruling
de novo unless the implied fact findings supported by the record are also
dispositive of the legal ruling.  Kelly, 204
S.W.3d at 819.

B. 
Miranda Warnings Not Required

The
State may not use a defendant’s statements, whether exculpatory or inculpatory, stemming from a custodial interrogation unless
the State demonstrates the use of procedural safeguards effective to secure the
privilege against self-incrimination.  Miranda, 384 U.S. at 444, 86
S. Ct. at 1612.  Additionally, article 38.22 of the code of criminal
procedure precludes the use of statements that result from a custodial
interrogation without compliance with certain procedural safeguards.  See
Tex. Code Crim. Proc. Ann. art. 38.22 (West 2005). 
If an investigation is not at an accusatorial or custodial stage, a person’s
Fifth Amendment rights have not yet come into play, and the voluntariness in
waiving those rights is not implicated.  Melton v.
State, 790 S.W.2d 322, 326 (Tex. Crim. App. 1990).

There
are at least four general situations when a suspect’s detention may constitute custody:
(1) when the suspect is physically deprived of his freedom of action in any
significant way, (2) when a law enforcement officer tells the suspect that he
cannot leave, (3) when law enforcement officers create a situation that would
lead a reasonable person to believe that his freedom of movement has been
significantly restricted, and (4) when there is probable cause to arrest and
law enforcement officers do not tell the suspect that he is free to leave.
 Dowthitt v. State, 931 S.W.2d 244, 255 (Tex. Crim. App. 1996); McCulley v. State, 352 S.W.3d 107, 115–16
(Tex. App.—Fort Worth 2011, pet. ref’d).
 In the first through third situations, the restriction upon freedom of
movement must amount to the degree associated with an arrest as opposed to an
investigative detention. Dowthitt,
931 S.W.2d at 255; McCulley,
352 S.W.3d at 116.  Concerning the fourth situation, which is of interest
in this case, the officers’ knowledge of probable cause must be manifested to
the subject, and such manifestation may occur if information sustaining the
probable cause is related by the officers to the suspect or by the suspect to
the officers.  Dowthitt, 931 S.W.2d at 255; McCulley,
352 S.W.3d at 116.  Situation four, however, will not automatically
establish custody; rather, custody is established if the manifestation of
probable cause, combined with other circumstances, would lead a reasonable
person to believe that he is under restraint to the degree associated with an
arrest.  Dowthitt, 931
S.W.2d at 255; McCulley, 352 S.W.3d at
116.  

In
this case, two detectives approached White in a park and detained him until
Detectives Cleveland and Sullivan arrived about five minutes later.
 Detectives Cleveland and Sullivan told White that they were investigating
a stolen cell phone and asked if White would go to the station with them for
questioning.  White agreed, asking if he could call his grandmother first.
 The detectives allowed him to do so.  They told White that he was
not being arrested, that he was not in custody, and
that after the interview, they would return him to his grandmother’s house,
which they did.  He was not handcuffed.   

White
first argues that he was in custody for Miranda purposes from the moment
that police traced Buckholz’s phone to him and saw
the band-aid on his finger at the park because a
reasonable person would believe he was under arrest.  But even if the
detectives had probable cause to arrest White at that point, it was not
manifested to him by the officers (nor by White to the
officers) at that time.  See Dowthitt,
931 S.W.2d at 255; see also Herrera v. State, 241 S.W.3d 520, 525–26
(Tex. Crim. App. 2007); cf. McCulley, 352
S.W.3d at 116.  To the contrary, the detectives told him more than once
that he was not under arrest, and he voluntarily consented to going to the
police station for questioning.  See Livingston v. State, 739
S.W.2d 311, 327 (Tex. Crim. App. 1987) (“[W]here a person voluntarily
accompanies investigating police officers to a certain location, and he knows
or should know that the police officers suspect that he may have committed or
may be implicated in committing a crime, that person is not ‘restrained’ or ‘in
custody.’”), cert. denied, 487 U.S. 1210 (1988); Miller v. State,
196 S.W.3d 256, 266 (Tex. App.—Fort Worth 2006, pet. ref’d)
(reasoning that appellant’s choice to voluntarily meet with police demonstrated
that police encounter was initially noncustodial).  

White
also argues that the encounter became a custodial interrogation during the
police station interview because a reasonable person would have believed he was
under arrest.  He relies heavily on Xu
v. State to support his argument.  See 100 S.W.3d 408, 414
(Tex. App.—San Antonio 2002, pet. ref’d). 
There, the court analyzed the following factors to determine that Xu was subject to a custodial interrogation from the moment
he made a “pivotal admission” to officers about his wife’s murder during a
stationhouse interrogation:  (1) whether the suspect arrived at the place
of interrogation voluntarily—Xu voluntarily submitted
to questioning, but the court stressed his distraught emotional state and the
facts that he was born in China, where there are no Miranda rights, and
that he spoke little English; (2) the length of the interrogation—Xu had been interrogated by multiple officers during
separate interviews over the course of eighteen hours and had been at the
police station for five hours before making his pivotal admission; (3) whether
the suspect’s requests to see relatives and friends are refused—Xu’s friend was not allowed to speak to him at the station;
(4) the degree of control exercised over the suspect—Xu
had not been told that he was free to leave for approximately five hours before
his pivotal admission, and he received one bottle of water and one restroom
break during that time; and (5) whether a “pivotal admission” established
custody—Xu made such an admission in the second
interview, shortly after officers confronted him with evidence pointing to him
as the suspect and said they did not believe his story.  Id. at 414–15.

In
this case, White voluntarily went with the police to the station for an
interview.  The interview lasted approximately one hour.[4] 
Prior to the interview, the detectives asked if White needed to use the
restroom or anything to eat or drink; White did not ask for anything or to see
anyone during the interview.  Detective Sullivan told White that he could
terminate it at any time and that the detectives would take him home.  The
detectives told White that he needed to tell them the truth because it would go
easier on him and that they needed to know what kind of person they are dealing
with.  White initially said he got the cell phone from a kid at school,
but approximately thirty minutes into the interview, Detective Sullivan asked
if there was any reason White’s DNA would be in Buckholz’s
house and if White would provide a DNA sample after the interview.  The
detectives said they knew White’s story was false and that they “could prove
it,” but they reiterated that they would take White home no matter what he
said.  See Dowthitt, 931 S.W.2d at
255 (noting that manifestation of probable cause must, combined with other
circumstances, lead a reasonable person to believe that he is under restraint
to the degree associated with an arrest).  Detective Sullivan then told
White that police were investigating a burglary and attempted sexual assault;
he asked White about the injury on his finger, saying he “[knew] how that
happened.”  White then admitted that he entered Buckholz’s
home to look for money, covered her mouth to prevent her from screaming, and
ran out with her phone.   

The
detectives continued to question White, telling him that they did not think he was
telling the truth about his motives or about not taking Buckholz’s
purse.  White never admitted that he had attempted to sexually assault her
or that he had taken her purse.  He maintained that he had told them
everything, and the detectives then ended the interview.  Thus, even
assuming White’s “pivotal admission” turned the interview into a custodial
interrogation, the continued interrogation did not reveal any additional
admissions subject to suppression.  See Ruth v. State, 645 S.W.2d
432, 436 (Tex. Crim. App. [Panel Op.] 1979) (holding that suspect’s statement
that he shot victim “immediately focused the investigation on him and furnished
probable cause to believe that he had committed an offense”; “[a]fter that time, the continued interrogation must be
considered a custodial one”).

The
objective circumstances surrounding White’s encounter with the detectives do
not show that a reasonable person in White’s situation would believe that he
was under restraint to the degree associated with an arrest.  See Dowthitt, 931 S.W.2d at 255; see also Estrada v.
State, 313 S.W.3d 274, 294–95 (Tex. Crim. App. 2010) (finding no custodial
interrogation when appellant voluntarily went to police station, police told
him several times that he was free to leave, and appellant said he wanted to
leave several times during the five-hour interrogation), cert. denied,
131 S. Ct. 905 (2011); see also Oregon v. Mathiason,
429 U.S. 492, 495–46, 97 S. Ct. 711, 714 (1977) (holding defendant not in
custody for Miranda purposes when he went to station voluntarily upon
police request, was informed that he was not under arrest, and was allowed to
leave station after thirty-minute interview during which police falsely stated
that his fingerprints were found at the scene).  Thus, the record supports
the trial court’s implied findings and conclusions that White’s confession was
not obtained as a result of a custodial interrogation in violation of Miranda. See Estrada, 313 S.W.3d at 294–95. 
We overrule this portion of White’s first issue.

C. 
No Improper Inducement

         
White also argues that his confession was involuntary because the detectives
made the following “promises” to him: they told him that they would return him
to his grandmother’s house after the interview regardless of what he told them,
and they told him that he needed to tell the truth, that “it would go easier on
him,” and that they “needed to know what kind of person he really was.” 
  

The
court of criminal appeals has held that a four-prong test must be met in order
to render a confession obtained by a promise of a benefit involuntary.  Sossamon v. State, 816 S.W.2d 340, 345 (Tex.
Crim. App. 1991), abrogated on other grounds by Graham v. State, 994
S.W.2d 651 (Tex. Crim. App.), cert. denied, 528 U.S. 974 (1999); see
also Fisher v. State, 379 S.W.2d 900, 902 (Tex. Crim. App. 1964).  The
promise must be (1) of some benefit to the defendant, (2) positive, (3) made or
sanctioned by a person in authority, and (4) of such character as would be
likely to influence the defendant to speak untruthfully.  Henderson v.
State, 962 S.W.2d 544, 564 (Tex. Crim. App. 1997), cert. denied, 525
U.S. 978 (1998).  In our review, we look to whether the circumstances of
the promise would reasonably induce a defendant to admit to a crime he did not
commit.  Sossamon, 816
S.W.2d at 345.

Here,
none of the detectives’ statements to White were of such an influential nature
as to likely influence White to confess untruthfully.  The detectives did
not condition their returning White to his home upon him telling the truth; the
detectives simply said they would drive White home after the interview, and
they did so.  See Henderson, 962 S.W.2d at 564; see also
Renfro v. State, 958 S.W.2d 880, 884 (Tex. App.—Texarkana 1997, pet. ref’d) (noting that an “if-then” relationship is required
to establish a promise, in other words, a conditional agreement in which a
confession is exchanged for favorable treatment).  And telling White that it would be “easier on him” if he told the
truth was not the type of “promise” that would make White believe that his
condition would be bettered by confessing, even falsely.  See Janecka v. State, 937 S.W.2d 456, 466 (Tex. Crim. App.
1996), cert. denied, 522 U.S. 825 (1997); see also Herrera v. State,
194 S.W.3d 656, 660 (Tex. App.—Houston [14th Dist.] 2006, pet. ref’d) (holding officer’s statement that he would “talk to
the District Attorney and would get an offer” was not specific enough to
influence an untruthful confession).  In fact, Detective Sullivan told
White that he was just a gatherer of information and would forward the
information to the district attorney’s office, which will “decide what
happens.”    

This
is not a situation in which the defendant “had nothing to lose and everything
to gain whether or not his confession was truthful.”  Cf. Sossamon, 816 S.W.2d at 345 (holding
defendant’s confession was involuntary when he was promised immunity from
prosecution for information regarding crimes in which he was involved). 
Viewing the record in the light most favorable to the trial court’s ruling and
deferring as we must to the trial court’s credibility determinations, we cannot
say that the trial court erred by finding that White’s confession was made
voluntarily.  See Wiede, 214 S.W.3d at 24; Kelly, 204 S.W.3d at 818.  We
overrule the remainder of White’s first issue.

V.  Motion for Mistrial

         
In his fifth issue, White argues that the trial court abused its discretion by
denying his motion for mistrial at the second punishment trial after Buckholz testified that she “knew that [White] had probably
been in [her] house earlier that day.”  White’s trial counsel objected to
this testimony on extraneous offense grounds; the trial court sustained the
objection and, per trial counsel’s request, instructed the jury to disregard
the testimony.  The trial court denied trial counsel’s motion for
mistrial.  

When
the trial court sustains an objection and instructs the jury to disregard but
denies a defendant’s motion for a mistrial, the issue is whether the trial
court abused its discretion by denying the mistrial.  Hawkins v. State,
135 S.W.3d 72, 76–77 (Tex. Crim. App. 2004).  A
mistrial is required only in extreme circumstances—when the prejudice caused by
the improper question and answer is incurable, i.e., “so prejudicial that
expenditure of further time and expense would be wasteful and futile.”  Ladd
v. State, 3 S.W.3d 547, 567 (Tex. Crim. App. 1999), cert. denied,
529 U.S. 1070 (2000).  In most instances, an instruction to disregard will
cure the alleged harm.  Wesbrook v.
State, 29 S.W.3d 103, 115 (Tex. Crim. App. 2000), cert. denied, 532
U.S. 944 (2001).  We consider the following factors in determining whether
the trial court abused its discretion by denying a motion for a mistrial: (1)
the severity of the misconduct, (2) curative measures, and (3) the certainty of
punishment assessed absent the misconduct.  Hawkins, 135 S.W.3d at
77; Mosley v. State, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998) (op. on reh’g), cert. denied, 526 U.S. 1070 (1999).  

Here,
Buckholz was recounting the events of the burglary
and assault at punishment and was explaining what White did after she told him
that she had herpes when she made the complained-of statement:

He stopped
fighting.  He stopped pulling [my pajama pants] down.  He just
froze.  And then he said that he didn’t believe me.  And I said that
he could go and check in the cabinets in the kitchen [to look for
medication].  And I knew that he had probably been in my house earlier that
day . . . because my house—   

 

Other
than this vague reference to White being “in [her] house” earlier that day, no
further references were made to the previous day’s burglary during the second
punishment trial, and any reference made to it at the guilt-innocence stage of
trial was made in front of a different jury.[5] 
The trial court immediately instructed the jury to disregard the statement, and
the court’s charge on punishment instructed the jury that it could consider
extraneous offense evidence only if it believed beyond a reasonable doubt that White committed such acts.  We presume the
jury followed these instructions absent evidence to the contrary.  See
Hutch v. State, 922 S.W.2d 166, 172 (Tex. Crim.
App. 1996).  The State presented compelling evidence that White entered Buckholz’s home and attempted to sexually assault her while
her son was in the room, including evidence that White’s blood was found on her
pajama pants, and the State presented evidence of the injuries sustained by Buckholz—a black eye, a busted lip, and injuries to her
teeth.  White was sentenced to eighteen out of a possible ninety-nine
years’ imprisonment for count one.  See Tex. Penal Code Ann. §
12.32(a).  We hold that any harm caused by the complained-of statement was
cured by the instruction to disregard and that, consequently, the trial court
did not abuse its discretion by denying White’s motion for mistrial.  We
overrule White’s fifth issue.

 

 

 

VI. Conclusion

Having
sustained White’s second issue in part and overruled the reminder of White’s
issues, we vacate and dismiss the trial court’s judgment on count two and
affirm the trial court’s judgment on count one.

 

 

SUE WALKER
JUSTICE

 

PANEL: 
LIVINGSTON, C.J.; WALKER and GABRIEL, JJ.

 

PUBLISH

 

DELIVERED:  February
21, 2013














[1]Other
“tie-breakers” recognized by the court of criminal appeals in conducting a
“most serious offense” test when both convictions have the same imprisonment
punishment include deadly-weapon findings, see Villanueva v. State, 227
S.W.3d 744, 749 (Tex. Crim. App. 2007), and restitution, see Ex parte
Cavazos, 203 S.W.3d at 338.  No restitution was assessed and no
deadly-weapon finding was entered for either of White’s convictions.  





[2]White
further argues that, all things being equal, he should be given the choice of
remedy for this violation of his constitutional rights, but the court of
criminal appeals has stated that “the ‘most serious offense’ test attempts to
take into account which conviction prosecutors would choose to retain,
while also continuing to meet the other policy considerations.”  Bigon, 252 S.W.3d at 373 (emphasis added). 





[3]Because
we set aside one of White’s convictions on double jeopardy grounds, we need not
address his third issue, arguing that the jury charge erroneously charged two
counts of burglary, and his fourth issue, arguing ineffective assistance to the
extent that his second issue was not preserved.  See Tex. R. App.
P. 47.1 (requiring appellate court to address only issues necessary to
disposition of appeal).   





[4]Detective
Cleveland testified that the interview lasted about an hour and a half, but she
later testified that the interview started at 5:02 and ended at 5:56.  The
videotape reveals that the interview concluded after about one hour but that
White remained in the room for another thirty minutes after the interview so
that officers could photograph him and his injuries.   





[5]During
the guilt-innocence stage (in front of the prior jury), Buckholz
testified that her home had been burglarized the day before White burglarized
her home, but she did not testify, and the State did not attempt to prove, that
White was involved in this burglary.